In re Phillip B. BUZZELLI, Debtor.

PNC Bank, National Association, formerly Pittsburgh National Bank, Plaintiff,

v.

Phillip B. Buzzelli, Defendant.

Bankruptcy No. 97–23888–MBM. Adversary No. 98–2056–MBM.

United States Bankruptcy Court, W.D. Pennsylvania, Pittsburgh Division.

March 2, 2000.

Beverly Weiss Manne and Michael A. Shiner, Pittsburgh, PA, for PNC Bank.

Charles F. Scarlata, Pittsburgh, PA, for Phillip B. Buzzelli.

Gary L. Smith, Pittsburgh, PA, Trustee.

### *MEMORANDUM OPINION*

M. BRUCE McCULLOUGH,
Bankruptcy Judge.

PNC Bank (hereafter "PNC"), plaintiff herein, via its instant adversary complaint (a) requests that this Court declare its judgment claim against Phillip Buzzelli, the above-captioned debtor and defendant herein, to be nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A)-(B), and (b) objects to the debtor's Chapter 7 discharge pursuant to 11 U.S.C. § 727(a)(3)-(5). By virtue of its Memorandum Opinion and Order of Court dated February 25, 1999 (hereafter "the February 25, 1999 Opinion"), the Court (a) denied PNC's request that its aforesaid judgment claim be declared nondischargeable, (b) overruled PNC's objection to the debtor's Chapter 7

discharge pursuant to § 727(a)(4), and (c) deferred resolving said objection to discharge pursuant to § 727(a)(3) and (5). *See* Feb. 25, 1999 Opinion, at 11. The Court, within the instant memorandum opinion, now addresses PNC's aforesaid objection to discharge pursuant to § 727(a)(3) and (5). A decision by the Court regarding PNC's objection to discharge under § 727(a)(3) and (5) is appropriate at this time given that (a) a trial was commenced on the matter on December 7, 1998, which trial was continued until March 25, 1999, and then concluded on May 3, 1999, (b) the debtor was afforded additional time subsequent to trial to produce recorded information which might support his cause under § 727(a)(3) and (5), and (c) several post-trial hearings were held on July 28, 1999, August 26, 1999, and September 30, 1999, for the purpose of allowing the parties to discuss, and the Court to assess, the sufficiency of the recorded information which the debtor produced subsequent to trial. For the reasons set forth below, the Court will sustain PNC's objection to, and consequently will deny entry of, the debtor's Chapter 7 discharge.

### STATEMENT OF FACTS

I. *Basis for PNC's Objection to the Debtor's Discharge.*

On or about June 29, 1989, the debtor and his then wife obtained a loan from PNC the default from which ultimately resulted in PNC's aforesaid judgment claim (hereafter "the PNC Loan"). *See* Feb. 25, 1999 Opinion, at 2. The PNC Loan originated via a Letter Agreement with PNC (hereafter "the Letter Agreement") wherein PNC offered, and the debtor and his then wife accepted, a $500,000 line of credit with PNC. *See Id.* The credit line was apparently granted so that the debtor and his then wife could consolidate other loans and for investment purposes. *See* PNC's Trial Ex. 10. Multiple advances were made on the line of credit through April 16, 1991, and, as a result, the out-

standing balance on the note accompanying the Letter Agreement, as of February 13, 1998, equalled $423,973.51 in principal with an additional $82,665.88 in accrued interest. *See* Feb. 25, 1999 Opinion, at 2–3.

In order to obtain the PNC Loan, the debtor and his then wife completed a Credit Application/Financial Statement dated March 16, 1989 (hereafter "the March 16, 1989 Financial Statement"). *See Id.* at 3. The Letter Agreement required the debtor to provide PNC with annual updates of the financial information contained in the March 16, 1989 Financial Statement. *See Id.* The debtor subsequently provided PNC with updated versions of the March 16, 1989 Financial Statement on (a) May 18, 1993, (b) July 20, 1993, and (c) December 21, 1995 (hereafter "the May 18, 1993, July 20, 1993, and/or December 21, 1995 Financial Statements;" the preceding financial statements, as well as the March 16, 1989 Financial Statement, hereafter shall be referred to collectively as "the Financial Statements" or "the four Financial Statements"). *See Id.*

The debtor maintained a solo medical practice specializing in ophthalmology at all pertinent times prior to the commencement of the instant case and for at least some time subsequent thereto. *See Id.* at 2. In each of the Financial Statements the debtor provided estimates of his annual gross income from said medical practice, with said estimates ranging from a low of $360,000 in 1989 to a high of $400,000 in 1992. *See Id.* at 4. The debtor also valued his medical practice at $400,000 in each of the last three Financial Statements. *See* PNC's Trial Ex. 3, 5 & 6.

The debtor indicated in each of the Financial Statements that he also owned various other assets, to wit:

(a) A partial interest in realty located in Naples, Florida (hereafter the "Florida Realty"), which realty, according to the Financial Statements, was titled in both his name and that of certain of his

relatives. *See* PNC's Trial Ex. 3–6. The Florida Realty is valued at $250,000 in Schedule C of the March 16, 1989, and May 18, 1993 Financial Statements, and at $350,000 in Schedule C of the July 20, 1993, and December 21, 1995 Financial Statements. *See Id.* The last three Financial Statements indicate that the Florida Realty, as of May 18, 1993, and subsequent thereto, was not encumbered by any mortgage. See PNC's Trial Ex. 3, 5 & 6.

(b) A personal collection of eleven Ferrari automobiles valued at (i) $4,000,000 as of March 16, 1989, (ii) $3,200,000 as of May 18, 1993, (iii) $3,000,000 as of July 20, 1993, and (iv) $2,500,000 as of December 21, 1995. *See* PNC's Trial Ex. 3–6.

(c) An art collection and a collection of rare wines, which collections are respectively valued at $100,000 and $90,000 in the March 16, 1989 Financial Statement. *See* PNC's Trial Ex. 4. However, only the art collection is listed in the May 18, 1993 Financial Statement, wherein said collection is valued at $100,000. *See* PNC's Trial Ex. 5. Neither collection is valued specifically in the July 20, 1993, and December 21, 1995 Financial Statements although both collections are apparently included in the $3,000,000 estimate for the debtor's Ferrari collection set forth in the July 20, 1993 Financial Statement. *See* PNC's Trial Ex. 3 & 6.

In contrast to the asset information contained within the Financial Statements, the debtor, in his Bankruptcy Schedule B, indicates that, as of his May 30, 1997 petition filing date, he owned, *inter alia,* (a) $5,000 in accounts receivable from his medical practice, (b) $18,000 in equipment, furnishings, and supplies used in his medical practice, (c) $3,225 on deposit in three different checking accounts, (d) six Ferrari automobiles valued collectively at $202,000, and (e) fifteen pieces of artwork valued collectively at $8,600. *See* Deb. Bankr.Sch. B. Nowhere in his Bankruptcy Schedule B does the debtor make provision for either an ownership interest in the Florida Realty or his rare wine collection. *See Id.*

PNC, in conjunction with two separate depositions or examinations of the debtor on October 6, 1997, and May 29, 1998, requested, by notices respectively dated September 25, 1997, and May 13, 1998, that the debtor produce a variety of documentation regarding both his medical practice and his personal assets. *See* PNC's Trial Ex. 26–27. In particular, PNC requested, *inter alia,* the following:

(a) Any and all documents and information pertaining to the debtor's Ferrari collection, such as copies of Certificates of Title for Vehicle, motor vehicle registrations, motor vehicle fiscal responsibility cards, appraisals, repair records, insurance policies, and ownership histories; the aforesaid information was sought with respect to not only cars owned by the debtor as of his petition filing date but also with respect to any vehicles that had been transferred, sold, or otherwise disposed of by the debtor since 1989.

(b) Any and all documents and information relating to personal property listed on financial statements provided to PNC by the debtor, including, in particular, the debtor's art and wine collection.

(c) Documentation pertaining to the transfer of any personalty or realty with a fair market value in excess of $5,000 by the debtor since 1989.

(d) Any and all bank records of the debtor, including bank account statements and cancelled checks; also, any notes, mortgages, security agreements, financing statements, or other similar documents involving the debtor.

(e) All federal, state and local tax returns for the debtor from 1988 until the present.

*See Id.* Despite the above requests by PNC for recorded information, the debtor failed to produce any documentation that was responsive to either of said requests

prior to the date upon which PNC filed its adversary complaint seeking a determination that its claim against the debtor be declared nondischargeable. *See* 3/25/99 Tr. at p. 4, li. 13—p. 12, li. 16. Presumably because of the debtor's failure to respond to PNC's aforesaid informational requests, PNC included within its aforesaid adversary complaint an objection to the debtor's discharge in bankruptcy pursuant to, *inter alia,* § 727(a)(3) and (5).

## II. *Document Production by the Instant Debtor at Trial and Subsequent Thereto.*

The debtor, by the close of trial on May 3, 1999, still had not produced any of the recorded information sought by PNC other than the requested tax returns. Furthermore, the debtor failed to produce at trial any documentation or witnesses to corroborate any of his testimonial explanations regarding the decline in value of his sizeable pre-petition asset holdings. Given the preceding, the Court, at the end of trial, could have then ruled on PNC's objection to the debtor's Chapter 7 discharge. Instead, however, the Court chose to exercise its discretion and afford to the debtor additional time to produce recorded information pertinent to the issues raised by PNC's discharge objection. The preceding discretion is vested in the Court by virtue of (a) the Court's inherent powers and 11 U.S.C. § 105(a), and (b) the plain language of § 727(a), which language does not mandate an automatic denial of a debtor's discharge in the event that the debtor's actions fall within the conduct specified in one or more of the paragraphs of § 727(a).[1] *See In re Borron,* 29 B.R. 122, 128 (Bankr.W.D.Mo.1983) ("even when grounds for the denial of discharge exist, it is still within the discretion of the bankruptcy court as to whether discharge should actually be denied"); *In re Suttles,*

819 F.2d 764, 765 (7th Cir.1987) (citing *Borron* for same); *In re Woodlands Investment Associates,* 95 B.R. 681, 683 (Bankr.W.D.Mo.1988) (citing *Borron* and *Woodlands Investment* for same). Therefore, the Court orally directed the debtor on May 3, 1999, to produce the following recorded information:

(a) Documentation regarding the debtor's Ferrari collection, including documentation pertinent to any transfers of Ferraris by the debtor since 1989. *See* 5/3/99 Tr. at p. 40, li. 7–8.

(b) Documentation regarding the debtor's ownership interest in the Florida Realty and his art collection. *See* 5/3/99 Tr. at p. 40, li. 12–17.

(c) Any and all books and records regarding the debtor's medical practice, including, at a bare minimum, documentation regarding his checking accounts. *See* 5/3/99 Tr. at p. 37, li. 17—p. 39, li. 24 and p. 40, li. 17–18.

On July 28, 1999, the Court held a post-trial hearing to ascertain the debtor's progress in complying with the Court's May 3, 1999 directive regarding production of documents. Although the debtor had, by July 28, 1999, apparently produced some information regarding his Ferrari collection and the Florida Realty interest, the amount of documentation was clearly insufficient in the Court's view to stave off a decision by the Court to deny entry of the debtor's discharge. Therefore, the Court once again issued an oral directive to the debtor, to wit: "What ... [the Court] want[s] is the best shot from the debtor at explaining his financial history within three or four years prior to this bankruptcy [case] *and documenting it.*" *See* 7/28/99 Tr. at p. 9, li. 17–19 (emphasis added).

---

1. With respect to the language in § 727(a), § 727(a) makes mandatory a grant of a debtor's discharge if none of the things in paragraphs (1)-(10) of said subsection can be established by an objecting party. However, the pertinent language in § 727(a) does not mandate the denial of a debtor's discharge if any of the things in paragraphs (1)-(10) can be so established. Therefore, the Court has discretion as to whether it will deny the debtor's discharge if any of the things in paragraphs (1)-(10) are established.

By August 26, 1999, which is when the Court held its next post-trial hearing, the debtor had produced the following in response to the Court's directives:

(a) The debtor's statements, cancelled checks, and check stubs for his checking account with PNC for the pre-petition period from December 1995 through May 1997, as well as similar documents for June 1997 and October 1997 through December 1997. *See* Oct. 4, 1999 Deb. Status Rep. Among the bank statements that were produced is one dated May 31, 1996, wherein it is indicated that two separate deposits totalling $33,000 were made into the PNC checking account on May 25, 1996, *see* PNC's Ex. C to Oct. 12, 1999 PNC Motion to Strike, etc.; a notation, presumably by the debtor, is made on said statement next to the two deposit figures indicating that the deposits were "not income from business." *See Id.* With respect to the cancelled checks that were produced, at least one was merely drawn to "cash" without additional detail. *See* PNC's Ex. B to Oct. 12, 1999 PNC Motion to Strike, etc.

(b) The debtor's statements and cancelled checks for his checking account with Stanton Federal Savings Bank (hereafter "Stanton") for the pre-petition period from April 1997 through May 1997 and for the post-petition period from June 1997 through October 1997, and a handwritten register paralleling said checks. *See* Oct. 4, 1999 Deb. Status Rep.

(c) A copy of a June 9, 1980 sales agreement for the Florida Realty (hereafter "the June 9, 1980 Sales Agreement"), wherein the debtor is named as a co-purchaser of said realty. *See* Ex. A to Oct. 4, 1999 Deb. Status Rep.

(d) A letter purporting to be from Ron Spangler (hereafter the "Spangler letter"), an automobile broker, wherein Spangler asserts that he (i) arranged for a trade of the debtor's Ferrari 330 GT 2+2 (hereafter the "Ferrari 330 GT 2+2") and $100,000 to an individual in Kansas City for a 512 TestaRossa Ferrari (hereafter the "512 TestaRossa Ferrari") in May 1990, and (ii) sold the debtor's 400 SA Cabriolet Ferrari (hereafter the "400 SA Cabriolet Ferrari") to an individual in New York for $75,000 in April 1996. *See* Ex. B to Oct. 4, 1999 Deb. Status Rep. The Spangler letter, rather than having been drafted contemporaneously with the two pertinent transactions in 1990 and 1996, *see Id.,* was apparently drafted on June 17, 1999, in response to a request from the debtor for information regarding the sales detailed therein. *See* Ex. A to July 27, 1999 PNC Status Rep. (letter from debtor's counsel).

(e) An August 21, 1999 affidavit from Louis C. Glasso, M.D. (hereafter the "Glasso affidavit"), wherein Glasso asserts that (i) he loaned the debtor money to finance the purchase of a 1967 Ferrari and a 1971 Ferrari (hereafter "the 1967 and 1971 Ferraris") from Baierl Chevrolet (hereafter "Baierl"), (ii) he understood that the 1967 and 1971 Ferraris previously had been the subject of a lease between the debtor and Baierl, which lease expired in May or June 1996, (iii) the aforesaid funds were loaned to the debtor in accordance with an Agreement of Loan/Sale dated June 6, 1996 (hereafter "the June 6, 1996 Agreement of Loan/Sale"), a copy of which is attached to the Glasso affidavit, (iv) the debtor failed to repay the borrowed funds to Glasso by August 6, 1996, (v) because the debtor failed to repay the borrowed funds to Glasso by August 6, 1996, Glasso was entitled to possession of the 1967 and 1971 Ferraris at that time, and (vi) he did not officially transfer to himself title to the 1967 and 1971 Ferraris until sometime after August 6, 1996. *See* Ex. C to Oct. 4, 1999 Deb. Status Rep. According to the June 6, 1996 Agreement of Loan/Sale,

two conditions of the transaction between the debtor and Glasso were that (i) Glasso would take a security interest in the 1967 and 1971 Ferraris, and (ii) if the debtor failed to repay the borrowed funds to Glasso by August 6, 1996, then the June 6, 1996 Agreement of Loan/Sale "w[ould] be considered a sale of both vehicles [by the debtor] to . . . Glasso." *See Id.* Also attached to the Glasso affidavit are copies of two cashier's checks which were apparently utilized by the debtor to purchase the 1967 and 1971 Ferraris from Baierl. *See Id.*

Additionally, the debtor's counsel represented to the Court at the August 26, 1999 post-trial hearing that the universe of the debtor's records with respect to his pre-petition medical practice are the bank statements, cancelled checks, and check stubs which were produced by the debtor. *See* 8/26/99 Tr. at p. 4, line 14–23; *see also* 9/30/99 Tr. at p. 2, li. 21–25 (same).

■■■ PNC responded to the documentation which the debtor had produced by August 28, 1999, by contending, *inter alia,* that:

(a) None of the bank account information which the debtor produced goes back further than December 1995, which date is only eighteen (18) months prior to the commencement of the instant case, notwithstanding the Court's July 28, 1999 directive to the debtor to produce recorded information going back three to four years prior to said commencement.

(b) The bank account information that was produced divulges neither the source of the deposits made into the bank accounts nor the justification for withdrawals therefrom.

(c) The alleged author of the Spangler letter and the affiant of the Glasso affidavit have not been subjected to cross examination by PNC.

(d) The contents of the Spangler letter and the Glasso affidavit (i) constitute inadmissible hearsay and must, therefore, be stricken from the record, (ii) are inconsistent with both trial testimony of the debtor on May 3, 1999, and with information contained in a multi-page document which sets forth the results of a search performed at PNC's behest of the records of the Pennsylvania Department of Motor Vehicles for vehicles titled in the name of the debtor as of December 2, 1996 (hereafter "the December 2, 1996 Pa. D.M.V. record search"),[2] and (iii) do

2. After reviewing the trial transcript from May 3, 1999, the Court is uncertain as to whether the December 2, 1996 Pa.D.M.V. record search was formally introduced by PNC for admission, and then admitted by the Court, into evidence. However, any such oversight by either PNC or the Court in the above regard can be, and is, rectified at this time by the Court's formal admission into evidence of the December 2, 1996 Pa.D.M.V. record search. The preceding action is warranted because (a) PNC presented the December 2, 1996 Pa.D.M.V. record search to the Court at the May 3, 1999 trial, (b) PNC identified said document as Trial Exhibit 28, (c) PNC made an offer of proof with respect to said document at the time of its presentation to the Court, (d) the debtor's counsel failed at any time to advance any objection to the admission into evidence, or the use during trial, of said document, and (e) said document was employed throughout the trial and subsequent thereto as if it had been admitted into evidence. *See generally* 38 P.L.E. *Trial* § 42 at 45–46 (West 1961) (formal introduction of document into evidence may be waived and oversight regarding admission of evidence may be corrected even after charge to jury). The Court also notes that, even if it were inclined at this time to entertain any objection to the admission into evidence of the December 2, 1996 Pa.D.M.V. record search, the Court would be constrained to overrule any such objection, and said document is admissible without any further action by PNC, because (a) the assertions contained in said document are excepted from the hearsay rule, *see* Fed.R.Evid. 803(8)(c), 28 U.S.C.A. (West 1984) (data compilation of public office or agency setting forth factual findings from investigation pursuant to authority granted by law), (b) said document is sufficiently authenticated as evidenced by (i) the heading at the top of each page of said document listing the address and phone number for the local branch of the Pennsylvania Department of

not address or resolve various issues with respect to the transactions discussed therein.

(e) The debtor, although he produced the June 9, 1980 Sales Agreement, failed to produce documentation supporting his earlier testimony that (i) he had made mortgage payments with respect to the Florida Realty, or (ii) he was listed as an owner of said realty on a homeowner's insurance policy with respect to said realty.

(f) The debtor did not provide any documentation with respect to his art or rare wine collection.

*See* Aug. 25, 1999 PNC Resp. to Prod. of Rec. by Deb. Because the Court generally agreed with the preceding points by PNC, and in response to the statement by debtor's replacement counsel on both July 28, 1999, and August 26, 1999, that said counsel was apparently unaware that the debtor needed to produce documentation which, as of August 26, 1999, had not yet been produced, the Court issued one final oral directive to the debtor to produce any and all pertinent documents that one with a $400,000 professional practice might be expected to keep. *See* 8/26/99 Tr. at p. 14, li. 23—p. 15, li. 14.

In response to this edict, the debtor, by September 30, 1999, produced forms that the debtor received simultaneous with payment from insurers such as Medicare and Blue Cross/Blue Shield (i.e., "Explanation of Benefits" forms), which documentation covered the year 1996 and which was produced in an apparent effort to identify the source of the deposits made by the debtor into his bank accounts. *See* Oct. 4, 1999 Deb. Status Rep. The debtor, at approxi-

mately the same time, also filed with the Court an affidavit from Eugene A. Brunozzi, the accountant for the debtor pre-petition, wherein Mr. Brunozzi states, *inter alia,* that (a) the debtor did not maintain books of original entry "because they were not necessary," (b) the debtor's checking account records by themselves were "more than adequate for ... [the debtor's own informational] needs," and (c) Mr. Brunozzi "represent[s] other professionals whose bookkeeping practices are the same as" that of the debtor. *See* Ex. E to Oct. 4, 1999 Deb. Status Rep. The produced documents and records described in this paragraph, along with that described in the preceding paragraphs, constitute the universe of recorded information that the debtor ultimately produced in response to the Court's three oral directives regarding document production.

### III. *The Instant Debtor's Testimony.*

As for oral testimony by the debtor, the debtor provided disparate testimony regarding his various assets during the trial on December 7, 1998, and May 3, 1999, and at various depositions held prior to the aforesaid trial dates. With respect to the debtor's bank accounts, the debtor testified that, at all times prior to the commencement of the instant case, he (a) controlled his bank accounts, (b) deposited money into the accounts, and (c) wrote checks on the accounts. *See* 12/7/98 Tr. at p. 16, li. 22—p. 17, li. 3. The debtor also testified that he (a) did not receive a paycheck from his medical practice, and (b) took a draw from, or transfer out of, his bank accounts whenever he needed money

Motor Vehicles, and (ii) the fax machine marking in the upper left-hand corner of each page of said document, *see* Fed.R.Evid. 901(b)(4) & (7), 28 U.S.C.A. (West 1984) (authentication by way of distinctive characteristics and the like, as well as by evidence that document is from public office where items of particular nature are kept), and (c) the Court can, and does, take judicial notice of the information contained in said document given that (i) said information is "capable of accu-

rate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," and (ii) the Court can take judicial notice without a request to do so, and at any stage in a proceeding. *See* Fed.R.Evid. 201(b)(2), (c) & (f), 28 U.S.C.A. (West 1984); *Haye v. United States,* 461 F.Supp. 1168, 1174 (C.D.Cal.1978) (court takes judicial notice of deeds recorded in Los Angeles County Index and the General Index itself).

for personal purposes. *See* 12/7/98 Tr. at p. 17, li. 4—15; 7/7/98 Dep. Tr. at p. 15, li. 1—12 (tab 5 to PNC App. to Sum. Judg. Mot.). The debtor further testified that (a) he maintained three bank accounts prior to the commencement of the instant case, (b) two of the accounts were with PNC and the other account was with Stanton, (c) the account with Stanton was apparently not opened until shortly before the debtor filed his bankruptcy petition, and (d) only one of the accounts with PNC was a traditional checking account, which account was apparently also the one that was primarily utilized by the debtor for business (ie., business deposits and withdrawals) and personal purposes (ie., draws and transfers for personal support). *See* 5/3/99 Tr. at p. 37, li. 17—p. 39, li. 24.

With respect to expenses of the debtor's medical practice, the debtor testified that he deducted approximately $109,000 and $101,000 in expenses on Schedule C of his federal income tax returns for 1992 and 1993, respectively. *See* 7/7/98 Dep. Tr. at p. 17, li. 11—21 & p. 19, li. 11—21 (tab 5 to PNC App. to Sum. Judg. Mot.). However, the debtor testified that he (a) felt that his business costs and expenses for those years were actually higher, and (b) did not take larger deductions because, when the tax returns for those years were completed, he no longer had anything with which to substantiate such additional costs and expenses. *See Id.*

With respect to the Florida Realty interest, the debtor testified that (a) he purchased said realty with his uncle for approximately $175,000 in either 1980 or 1981, (b) he owned an equal one-half interest in said realty from the date of its original purchase, (c) he was nevertheless informed by his uncle, subsequent to the commencement of the instant case, that he might not ever have been listed on a deed as a co-owner of said realty, and (d) although said realty is valued at $350,000 in the July 20, 1993 and December 21, 1995 Financial Statements, said realty was actually then worth approximately $250,000 as

reflected in the two earlier Financial Statements. *See* 12/7/98 Tr. at p. 127, li. 10—p. 128, li. 11 & p. 133, li. 18—p. 136, li. 15; 5/3/99 Tr. at p. 29, li. 17—p. 35, li. 7; 10/16/97 Dep. Tr. at p. 58–59 & 6/3/98 Dep. Tr. at p. 30–32 (tabs 3 and 4 to PNC App. to Sum. Judg. Mot.). The debtor also testified that he (a) was listed on a mortgage note with respect to the Florida Realty, (b) made payments on said mortgage note during the 1980s and in the early 1990s, (c) was under the impression that, at least at some point in time, he owned his interest in said realty free and clear, (d) was listed as an owner of the realty on a homeowner's insurance policy for said realty, and (e) has located copies of the aforesaid homeowner's insurance policy and mortgage note since the December 7, 1998 trial date. *See Id.* Finally, the debtor testified that (a) he relinquished his interest in the Florida Realty prior to his May 30, 1997 petition filing, although he was unsure as to whether said disposition occurred (i) in the last nine days of 1995, (ii) in early 1996, or (iii) within one year of his May 30, 1997 petition filing date, (b) he sold his interest in the Florida Realty to his uncle and his uncle's family, (c) said transfer was by "word of mouth," unaccompanied by a closing, and not accomplished by the writing of a check, (d) he signed a form with respect, but subsequent, to said transfer, although he no longer has this particular form, and (e) his uncle's family bought out his interest in said realty by relieving the debtor from paying his share of renovations that were made to said realty, with said renovations totalling over $100,000. *See Id.*

As for the Ferrari 330 GT 2+2, the debtor testified that he did not include said vehicle in his bankruptcy schedules as having been owned by himself on his petition filing date because he traded said vehicle in 1990 to an individual named Ian for the 512 TestaRossa Ferrari. *See* 5/3/99 Tr. at p. 5, li. 13—p. 10, li. 20. In response to a query from PNC as to why the December 2, 1996 Pa.D.M.V. record search indicates

that the debtor still owned the Ferrari 330 GT 2+2 as of December 2, 1996, the debtor testified that (a) the individual named Ian did not physically take possession of said vehicle until three years subsequent to the trade in 1990, (b) Ian had not transferred title to said vehicle to himself during the aforesaid three-year period, and (c) he was unaware whether Ian had ever transferred title to said vehicle. *See Id.* As for why the 512 TestaRossa Ferrari was not included in his bankruptcy schedules, the debtor testified that said vehicle was sold in the autumn of 1995, with the proceeds from said sale being utilized to pay off a loan with Northside Bank. *See Id.* The debtor testified that (a) he has found documentation regarding the 1990 trade although he failed to bring said documentation to the May 3, 1999 trial, and (b) he does not have any documentation regarding the 1995 sale. *See Id.*

Regarding the 400 SA Cabriolet Ferrari, the debtor testified that he (a) did not include said vehicle in his bankruptcy schedules as having been owned by himself on his petition filing date because he sold said vehicle in the spring of 1996, (b) was certain that this particular vehicle was transferred prior to May 1996 notwithstanding his lack of records with respect to said transfer because he was out of town in May 1996 and the transfer was consummated before he left town, and (c) could not explain why said vehicle, if it was sold in the spring of 1996, appears on the December 2, 1996 Pa.D.M.V. record search as having been owned by the debtor on December 2, 1996. *See 5/3/99* Tr. at p. 11, li. 25—p. 13, li. 11.

With respect to the 1967 and 1971 Ferraris, the debtor testified that said vehicles are presently owned and possessed by Glasso despite the fact that said vehicles are shown on (a) the debtor's Bankruptcy Schedule B as being among the six Ferraris still owned by him as of his petition filing date, and (b) the debtor's Bankruptcy Schedule D as collateral for an outstanding secured debt to Glasso. *See*

*5/3/99* Tr. at p. 18, li. 18—p. 27, li. 5. The debtor also testified that he could not understand why the December 2, 1996 Pa. D.M.V. record search indicates that, as of December 2, 1996, (a) the debtor still owned said vehicles, and (b) said vehicles were encumbered by a lien in Baierl's favor. *See Id.* Instead, according to the debtor, he leased the two vehicles from Baierl until at some point in the spring of 1996 when said leases expired. *See Id.* Upon the expiration of said leases with Baierl, according to the debtor, the two vehicles were then purchased by a leasing company owned by Glasso. *See Id.* The remainder of the debtor's testimony with respect to the 1967 and 1971 Ferraris can best be characterized as bewildering since the debtor (a) testified at one point that Glasso, upon purchasing said vehicles from Baierl, then leased the vehicles back to the debtor despite the fact that the debtor never made any lease payments to Glasso, (b) appeared to testify at another point that he thought that Glasso, upon purchasing said vehicles from Baierl, then actually sold the vehicles back to the debtor (the debtor apparently thought as much because, according to the debtor, he apparently did not wish to continue leasing said vehicles but rather wished to own them), and (c) testified that he never owned said vehicles subsequent to the expiration of the Baierl leases notwithstanding his obvious confusion as to whether he had subsequently leased or purchased the vehicles from Glasso. *See Id.* Finally, the debtor testified that he retained possession of at least one, and perhaps both, of the two vehicles as of the date of his petition filing on May 30, 1997, notwithstanding his failure to make any payments to Glasso after Glasso's purchase of the vehicles in the spring of 1996. *See Id.*

With respect to the debtor's art collection, the debtor testified that (a) said art collection was never worth the $100,000 valuation which he attributed to said collection in the Financial Statements, (b) the aforesaid $100,000 valuation was merely an

estimate by the debtor of the artwork's value, and (c) he has found some old receipts pertaining to the purchase of certain of the art collection. *See* 5/3/99 Tr. at p. 27, li. 7—p. 29, li. 16.

With respect to the debtor's rare wine collection, PNC represented to the Court that (a) the debtor provided deposition testimony regarding said collection although PNC did not provide the Court with a copy of said testimony, and (b) the debtor testified, in particular, that he (i) possessed approximately 2,000 bottles of wine at one time, (ii) didn't have any appraisal information for his wine collection, (iii) had disposed of most of the wine prior to the commencement of the instant case, and (iv) did not have any information or documentation regarding the disposal of the wine. *See* 3/25/99 Tr. at p. 9, li. 20—p. 10, li. 1 & p. 14, li. 13—p. 16, li. 15. The debtor did not offer any testimony at trial regarding his rare wine collection.

The debtor testified generally that he did not throw away any boxes of records or, for that matter, anything. *See* 12/7/98 Tr. at p. 29, li. 1—16. He testified, however, that (a) some of his records were either lost, stolen, or mixed up, (b) his office had been burglarized twice within a seven- or eight-month period ending in March 1997, and (c) he lost some documents as a result of at least the second of said burglaries. *See Id.* Notwithstanding the preceding testimony, the debtor failed to (a) produce any evidence to support said testimony, such as a copy of a police report or an insurance claim, (b) list any loss from such theft in question 8 in the debtor's Bankruptcy Statement of Financial Affairs, and (c) explain, in answer to question 17c in said Statement of Financial Affairs, that certain recorded information was no longer available due to theft. Additionally, the debtors' counsel represented to the Court that the debtor had moved several times in the past few years, and that he had misplaced documentation as a result of the moves, *see* 7/28/99 Tr. at p. 4, li. 12—21; however, no explanation was offered as to why said documentation was not taken better care of and, in any event, no representation was made to the Court that said documentation was permanently lost due to the moves. Finally, although the debtor testified that some of his records had either been lost, stolen, or mixed up, the debtor failed to inform the Court as to precisely which records he was now thereby missing.

## IV. Other Recorded Information Considered by the Court.

An examination of the debtor's federal income tax returns for the years 1989–1996 reveals that the debtor operated his medical practice on a cash rather than accrual basis, which fact is consistent with other evidence produced regarding said medical practice. Said tax returns reflect the following pertinent income and expense data with respect to the debtor's medical practice:

| | Gross Income | Total Expenses | Net Income |
|------|-------------|----------------|-----------|
| 1989 | $409,433 | $125,085 | $284,348 |
| 1990 | 406,865 | 111,418 | 295,447 |
| 1991 | 448,625 | 110,532 | 338,093 |
| 1992 | 414,130 | 109,070 | 305,060 |
| 1993 | 377,166 | 101,228 | 275,938 |
| 1994 | 373,569 | 107,441 | 266,128 |
| 1995 | 343,283 | 100,571 | 242,712 |
| 1996 | 207,191 | 88,160 | 119,031 |

*See* PNC's Trial Ex. 15–22 (Debtor's Form 1040, Sch. C, for 1989–1996).

An examination of the debtor's post-petition operating reports reveals that the debtor continues to utilize his post-petition bank checking account in the same fashion that he used his checking account pre-petition; in other words, the debtor makes check withdrawals from his post-petition checking account, which is with Stanton, to pay both his business and personal expenses. *See* U.S. Trustee Monthly Oper. Rep., June—Sept.1997, docket nos. 19, 29, 30 & 39 (Bank Acct. Disbursements).

### DISCUSSION

PNC, as indicated in the preamble to this opinion, objects to the debtor's Chap-

ter 7 discharge pursuant to § 727(a)(3) and (5). Section 727(a)(3) and (5) provides that:

> [t]he court shall grant the debtor a discharge, unless—
>
> .　　.　　.　　.　　.
>
> (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case; [or]
>
> .　　.　　.　　.　　.
>
> (5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities.

11 U.S.C.A. § 727(a)(3) & (5) (West 1993). In its adversary complaint, PNC objects to the debtor's discharge under § 727(a)(3) and (5) because, in particular, PNC asserts that the debtor (a) unjustifiably failed to keep or preserve any recorded information from which one might be able to ascertain, *inter alia*, the debtor's financial condition with respect to his Ferrari collection or the Florida Realty interest, and (b) failed to explain satisfactorily, *inter alia*, the loss of certain of the Ferraris and the Florida Realty interest prior to the debtor's petition filing. Furthermore, PNC, in its complaint, refers to the debtor's Ferrari collection and the Florida Realty interest as mere examples of assets for which the debtor either failed to keep or preserve adequate recorded information, or for which the debtor unsatisfactorily explained a loss of such assets. Therefore, PNC is consistent with, and thus does not stray from, its initial pleadings by also averring the following throughout the trial on this matter, and subsequent to the debtor's

eventual production of recorded information:

(a) That the debtor did not keep or preserve adequate recorded information from which one might be able to ascertain the financial condition of, or recent transactions with respect to, the debtor's medical practice;

(b) That the debtor failed to keep or preserve adequate recorded information from which one might be able to ascertain the debtor's financial condition with respect to either his art collection or his rare wine collection; and

(c) That the debtor failed to explain satisfactorily the loss of large portions of his art collection and rare wine collection prior to the debtor's petition filing.

As indicated in the preamble to this opinion, and for the reasons set forth below, the Court will sustain PNC's objection to the debtor's Chapter 7 discharge pursuant to § 727(a)(3) and (5).

### I. *Application of § 727(a)(3) to the Facts in the Instant Case.*

#### A. *Law Pertinent to § 727(a)(3).*

As the Third Circuit stated in *Meridian Bank v. Alten*, 958 F.2d 1226 (3rd Cir.1992):

> The purpose of section 727(a)(3) is to give creditors and the bankruptcy court complete and accurate information concerning the status of the debtor's affairs and to test the completeness of the disclosure requisite to a discharge. The statute also ensures that the trustee and creditors are supplied with dependable information on which they can rely in tracing a debtor's financial history.

*Meridian Bank*, 958 F.2d at 1230 (citations omitted). A creditor objecting to a discharge under § 727(a)(3) has the initial burden of proving "(1) that the debtor failed to maintain and preserve adequate records, and (2) that such failure makes it impossible to ascertain the debtor's financial condition and material business transactions." *Id.* at 1232. Once a "creditor

make[s] an initial showing that the debtor's records are inadequate ... the burden is [then] on the debtor to prove justification [for said inadequacies]." *Id.* at 1233. The respective burdens of proof placed upon an objecting creditor and the debtor under § 727(a)(3) are that of persuasion, *see Id.*, and said burdens must be met by a preponderance of the evidence. *See In re Ishkhanian,* 210 B.R. 944, 949 (Bankr. E.D.Pa.1997) (relying on *Grogan v. Garner,* 498 U.S. 279, 285–91, 111 S.Ct. 654, 658–61, 112 L.Ed.2d 755 (1991)); *In re Blanchard,* 201 B.R. 108, 114 (Bankr. E.D.Pa.1996) (same); *In re Maletta,* 159 B.R. 108, 111 (Bankr.D.Conn.1993) (same); *In re Carter,* 236 B.R. 173, 180 (Bankr. E.D.Pa.1999) (citing *Ishkhanian* and *Grogan* ); *In re Kisberg,* 150 B.R. 354, 356 (Bankr.M.D.Pa.1992). With respect to the specific time period for which a debtor is required to account for his pre-petition financial condition under § 727(a)(3),

> [i]n the ordinary consumer bankruptcy case, it is probably reasonable to limit an inquiry ... to a period of two years before the commencement of the case, in the absence of evidence suggesting earlier fraudulent transfers or other sanctionable or avoidable dissipation of assets. However, the Bankruptcy Court *should not circumscribe the inquiry which a trustee, creditor, or other party in interest may properly make under §§ 727(a)(3) and 727(a)(5) by setting a hard-and-fast rule* limiting the inquiry to events and transactions occurring within a specific number of months or years before the bankruptcy case.

*In re Losinski,* 80 B.R. 464, 472 (Bankr. D.Minn.1987) (emphasis added) (also citing numerous cases where the time period of inquiry with respect to a debtor's pre-petition financial condition and transactions substantially exceeded two years in length). In order for a creditor to prevail under § 727(a)(3), "the court need not find that the debtor intended to conceal his financial condition." *Meridian Bank,* 958 F.2d at 1234. As well, creditors can prevail under § 727(a)(3) without showing that they have been materially injured by a debtor's failure to keep or preserve records. *See In re Dynak,* 171 F.Supp. 231, 233 (D.Mass.1959).

As for whether a debtor's records are sufficiently adequate so as to satisfy § 727(a)(3),

> [t]he Bankruptcy Code does not require a debtor seeking a discharge specifically to maintain a bank account, nor does it require an impeccable system of bookkeeping. Nevertheless, the records must " 'sufficiently identify the transactions [so] that intelligent inquiry can be made of them.' The test is whether 'there [is] available written evidence made and preserved from which the present financial condition of the bankrupt, and his business transactions for a reasonable period in the past[,] may be ascertained.' "

*Meridian Bank,* 958 F.2d at 1230 (citing *In re Decker,* 595 F.2d 185, 187 (3rd Cir. 1979)). So that a debtor's records allow for "intelligent inquiry," said records may be neither (a) "chaotic or incomplete," *see Id.* (citing *In re Cox,* 904 F.2d 1399, 1401 (9th Cir.1990)), (b) in such a condition that a creditor is "required to speculate as to the financial history or condition of the debtor," *In re Juzwiak,* 89 F.3d 424, 428 (7th Cir.1996) (citing, *inter alia, In re Frommann,* 153 B.R. 113, 117 (Bankr. E.D.N.Y.1993); *In re Pimpinella,* 133 B.R. 694, 698 (Bankr.E.D.N.Y.1991)), nor (c) in such a condition that a "creditor [is compelled] to organize and reconstruct the debtor's business affairs." *Juzwiak,* 89 F.3d at 429 (citing, *inter alia, Frommann,* 153 B.R. at 117–18; *Pimpinella,* 133 B.R. at 698–99; *In re Morando,* 116 B.R. 14, 16 (Bankr.D.Mass.1990); and *In re Hughes,* 873 F.2d 262, 264 (11th Cir.1989)); *see also In re Goldstein,* 123 B.R. 514, 525 (Bankr. E.D.Pa.1991) (citing numerous cases); *In re Dias,* 95 B.R. 419, 422–23 (Bankr. N.D.Tex.1988). Furthermore, a debtor's records must be such that " '[c]reditors ... [need] not be forced to undertake an

independent investigation of a debtor's affairs." ' *Juzwiak,* 89 F.3d at 429 (citing *United States v. Ellis,* 50 F.3d 419, 425 (7th Cir.1995)). Finally, "[t]he test [with respect to the adequacy of the debtor's recorded information] is not whether the debtor[, from an examination of his records,] could determine what was happening in his business (a subjective standard), but [rather] whether a third-party such as a trustee or creditor could determine from the records what was happening in the debtor's business (an objective standard)." *In re Ogden,* 1999 WL 282732 (10th Cir. BAP 1999). The preceding is a corollary of the rule that creditors, a trustee, and the courts "are not required to rely on a debtor's oral representations concerning . . . [his or her financial condition and business transactions] without also having some independent means of substantiating such representations." *In re Rusnak,* 110 B.R. 771, 776 (Bankr.W.D.Pa.1990); *Juzwiak,* 89 F.3d at 429; *In re Shapiro,* 59 B.R. 844, 848 (Bankr.E.D.N.Y.1986); *Pimpinella,* 133 B.R. at 698.

▮▮▮▮ As for the requirement that an objecting creditor show that a debtor's failure to maintain and preserve adequate records makes it impossible to ascertain the debtor's financial condition and material business transactions, "no court has suggested that . . . [said requirement] means that a debtor is relieved from the burden of providing records unless the creditor can show the impossibility of discovering each piece of necessary financial information." *In re Wazeter,* 209 B.R. 222, 229 (W.D.Mich.1997) (interpreting the *Meridian Bank* decision). Furthermore, the separate "impossibility" requirement imposed by the Third Circuit in *Meridian Bank* can necessarily mean no more than that a creditor, in order to prevail under § 727(a)(3), must demonstrate that the state of a debtor's recorded information is such that a creditor cannot possibly ascertain said debtor's financial condition and material business transactions without organizing, reconstructing, independently investigating, and/or accepting oral representations by said debtor regarding said debtor's affairs. The preceding conclusion by the Court follows because a creditor cannot be compelled to (a) organize and reconstruct a debtor's affairs, *see supra* p. 96, (b) undertake an independent investigation of a debtor's affairs, *see supra* p. 96, or (c) accept a debtor's oral representations regarding his or her affairs, *see supra* p. 96. Were the "impossibility" requirement to be construed otherwise, then most, if not all, debtors would prevail under § 727(a)(3) without producing meaningful documentation because a creditor, if it expends an infinite amount of time, money, and effort in organizing, reconstructing, and/or independently investigating a debtor's affairs, will likely be able to ultimately ascertain a debtor's financial condition and material business transactions. Quite obviously, the Third Circuit could not have intended, and Congress most certainly did not intend, to impose upon creditors such an insurmountable burden before they could prevail under § 727(a)(3).

▮▮▮▮ Regarding the justification that must be demonstrated by a debtor if his or her records are inadequate,

[t]he Bankruptcy Code does not specify what constitutes justification for maintaining inadequate records; instead it requires the trier of fact to make a determination based on all the circumstances of the case.

The issue of justification depends largely on what a normal, reasonable person would do under similar circumstances. The inquiry should include the education, experience, and sophistication of the debtor; the volume of the debtor's business; the complexity of the debtor's business; the amount of credit extended to [the] debtor in his business; and any other circumstances that should be considered in the interest of justice.

*Meridian Bank,* 958 F.2d at 1231 (citing *In re Wilson,* 33 B.R. 689, 692 (Bankr. M.D.Ga.1983)).

▉▉▉▉ Based on the preceding, a "debtor[, as a justification for failure to maintain and preserve adequate records,] cannot assert an honest belief that he or she did not need to keep the records." *In re Pulos,* 168 B.R. 682, 692 (Bankr.D.Minn. 1994). "Instead, debtors have a duty to preserve those records that others in like circumstances would ordinarily keep." *Id.* Thus, "[t]he test for justification is an objective one." *Id.* "Sophisticated business persons are generally held to a high level of accountability in record keeping." *Meridian Bank,* 958 F.2d at 1231. "The more complex the debtor's financial situation, the more numerous and detailed the debtor's financial records are supposed to be." *Pulos,* 168 B.R. at 692 (citing *In re Martin,* 124 B.R. 542, 543 (Bankr.N.D.Ind. 1991)). In assessing the complexity of, and then considering, a debtor's financial situation, a court must take into account not only the amount of credit extended to a debtor in his business but also the debtor's overall personal financial structure. *See Id.* (citing *In re Kassoff,* 146 B.R. 194, 200 (Bankr.N.D.Ohio 1992); *In re Wolfson,* 139 B.R. 279, 287 (Bankr.S.D.N.Y.1992); *In re Wiess,* 132 B.R. 588, 592 (Bankr. E.D.Ark.1991)). Notwithstanding the preceding, "[f]ew consumer debtors maintain anything more than, at most, a collection of bills, receipts and canceled checks, and, absent a sudden and large dissipation of assets, a discharge should not be denied in *a typical consumer* bankruptcy case due to a lack of books or records." 6 *Collier on Bankruptcy* ¶ 727.03[3][g] at 727–36 (Bender 1999) (emphasis added).

▉▉▉▉ Finally with respect to said justification, a debtor can justify his or her failure to preserve adequate records if said records were lost or stolen. *See, e.g., In re Nazarian,* 18 B.R. 143, 149 (Bankr.D.Md. 1982). However, and of course, as with any other justification that is offered by a

debtor, said debtor has the burden of proving such loss or theft. *See Id.*

**B.** ***The Instant Debtor's Manner Of, and Failure in, Producing Recorded Information in the Instant Case.***

▉▉▉▉ Before proceeding to analyze PNC's action under § 727(a)(3) in detail, the Court wishes to address separately the debtor's manner of, and failure in, producing recorded information in the instant case. In particular, and for the reasons set forth below, the Court has been, and remains, especially troubled by:

(a) The fact that, with the exception of his federal income tax returns, the debtor produced nothing in the way of recorded information prior to December 7, 1998, which date is when the trial in the instant adversary proceeding commenced, despite (i) PNC's two prior formal requests for numerous records and documents, and (ii) the debtor's obligation, commencing with his petition filing over one and one-half years (1½) earlier, to turn over said recorded information to the Chapter 7 trustee, *see* 11 U.S.C.A. § 521(4) (West 1993) ("The debtor shall . . . [,] if a trustee is serving in the case, surrender to the trustee[, *inter alia,*] *all property of the estate*"); *see also In re Hyde,* 222 B.R. 214, 218 (Bankr.S.D.N.Y.1998) (all books and records of a debtor, *including those not relating to property of the debtor's bankruptcy estate,* are property of his bankruptcy estate pursuant to 11 U.S.C. § 541(a)(1)); *In re Blinder, Robinson & Co., Inc.,* 140 B.R. 790, 794 (D.Colo.1992) (same);

(b) The fact that, with the exception of the aforesaid tax returns, the debtor still had not produced any recorded information prior to March 25, 1999, despite (i) the Court's February 25, 1999 Order of Court, wherein the Court, *inter alia,* expressly put the debtor on notice that PNC's discharge objections under § 727(a)(3) and (5) would be

considered separately on March 25, 1999, (ii) the continued outstanding formal requests by PNC for recorded information, and (iii) the continued outstanding obligation on the debtor's part to turn over recorded information to the Chapter 7 trustee;

(c) The debtor's failure to appear before this Court on the March 25, 1999 trial date, along with the debtor's failure to provide (i) prior notice that he would not so appear, and (ii) just cause subsequently for either failing to so appear or failing to provide advance notice that he would not so appear, *see* 3/25/99 Tr. at p. 26, li. 14—p. 30, li. 21 & p. 33, li. 22—p. 34, li. 3; 5/3/99 Tr. at p. 29, li. 2—li. 7; 7/28/99 Tr. at p. 5, li. 9—25; [3]

(d) The fact that, with the exception of the aforesaid tax returns, the debtor still had not produced any recorded information prior to May 3, 1999, which date is when the Court concluded the trial in the instant adversary proceeding;

(e) The inordinately piecemeal fashion in which the debtor produced those documents which he ultimately produced in response to the Court's May 3, 1999 document production directive, which method of document production necessitated the Court's two subsequent directives to produce documentation;

(f) The debtor's failure to produce more recorded information than that which he ultimately produced despite (i) the Court's recognition that the debtor may have geographically moved several times in recent years, and that the debtor may have misplaced certain of his recorded information as a result thereof, and (ii) the Court's consequent allowance to the debtor of additional time subsequent to trial to produce those documents which he allegedly had so misplaced;

(g) The debtor's failure to produce, in particular, three pieces of recorded information which, according to the debtor's testimony, he not only retains but has also located, to wit (i) a copy of a homeowner's insurance policy listing the debtor as an owner of the Florida Realty and a copy of a mortgage agreement pertaining to said realty, *see supra* p. 92, (ii) documentation evidencing the 1990 trade of the Ferrari 330 GT 2+2, *see supra* pp. 92–93, and (iii) receipts evidencing the debtor's purchase of a portion of his art collection and the amount of said purchases, *see supra* p. 94; and

(h) The potential that the debtor, notwithstanding all of the above, will continue to assert that he possesses pertinent documentation that he has yet to produce.

The Court's aforesaid discomfiture stems from the fact that a debtor's mere failure to produce documentation to an objecting creditor, at least according to the plain language of § 727(a)(3) or any other

---

**3.** As evidenced by the transcript excerpts that are cited immediately prior to this footnote, the only reason that has ever been given by either the debtor or his counsel for the debtor's failure to appear before the Court on March 25, 1999, was that the debtor was then in attendance at a wedding for his cousin's daughter in Italy. The Court summarily concludes that the debtor's attendance at such a wedding does not constitute just cause for the debtor's failure to appear at a trial regarding an objection to his own discharge in bankruptcy. Furthermore, the debtor's mere attendance at a wedding does not provide any justification for the debtor's failure to apprise the Court in advance that he would not be able to attend the trial on March 25, 1999. Finally, the Court need not ponder further whether, although the Court frankly is of the view that, the debtor's unjustified failure to appear at trial on March 25, 1999, constitutes a separate ground for denial of his Chapter 7 discharge via 11 U.S.C. § 727(a)(6)(A) given that (a) the Court's February 25, 1999 Order of Court, *inter alia*, expressly put the debtor on notice that PNC's discharge objections under § 727(a)(3) and (5) would be considered on March 25, 1999, and (b) the debtor, in light of the preceding express notice, was thereby put on notice that he also needed to personally appear at trial on March 25, 1999.

portion of § 727(a), is not itself actionable such that a debtor may thereby be denied his or her discharge.[4] Instead, an objecting creditor, in order to prevail under § 727(a)(3), must establish that a debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information. With that being the case, a debtor is left free to argue, if he or she wishes, that he or she (a) has not committed any of the aforesaid acts with respect to recorded information, (b) instead simply has failed to produce such recorded information for whatever reason, and (c) should not, as a consequence of his or her failure to produce documentation, be denied a discharge under § 727(a)(3) since none of the enumerated acts have occurred.

The Court, of course, can deal with such a failure by a debtor to produce documents by either (a) finding that an objecting creditor has established, by the necessary preponderance of the evidence, that a debtor has concealed or failed to keep or preserve any documentation that has not been produced by the time of the Court's final decision with respect to § 727(a)(3), or (b) entering the preceding finding of fact as a sanction pursuant to Fed.R.Civ.P. 37(b)(2). However, the Court is always somewhat reluctant to take either of the above actions given that (a) they could be fatal to the entry of a debtor's discharge, and (b) good cause may exist for a debtor's failure to produce documentation. Nevertheless, at the same time the Court notes

that, without a production of pertinent documentation by a debtor, (a) it is extremely difficult, if not impossible, for an objecting creditor to establish that documentation allegedly maintained and preserved by a debtor is inadequate for purposes of § 727(a)(3), and (b) the cause of an objecting creditor under § 727(a)(3) will thus generally be greatly prejudiced.

■■■■■ In the instant case, the debtor, in fact, (a) argues that he neither concealed, destroyed, mutilated, falsified, or failed to keep or preserve adequate recorded information for purposes of § 727(a)(3), (b) testified that he actually possesses certain of the documentation which supposedly would establish that he retains adequate recorded information under § 727(a)(3), see supra p. 99, and (c) failed to produce such documentation that he allegedly possesses because, according to the debtor and his counsel, he has geographically moved several times and such documentation has become misplaced. See supra p. 94. Thus, the Court has been, and remains, faced with the dilemma to which it referred in the preceding paragraph. The Court dealt with such dilemma at trial and subsequent thereto by allowing the debtor substantial additional time to locate and produce recorded information which should have been produced prior to, or by the time of, trial. However, in light of, inter alia, the passage of said additional time and the Court's three oral document production directives to the debtor, and notwithstanding that the debt-

4. The Court is aware of case authority for the proposition that Fed.R.Bankr.P. 4005, which rule places upon an objecting creditor the burden of proving an objection to discharge under § 727(a), "does not change the initial burden which is placed upon the debtor of producing records from which his financial condition may be ascertained." In re Delancey, 58 B.R. 762, 767 (Bankr.S.D.N.Y.1986); see also In re Switzer, 55 B.R. 991, 996 (Bankr.S.D.N.Y.1986) (same). Unfortunately, the Court is not entirely certain from precisely where this initial record production burden to which these courts refer originates vis-a-vis creditors (ie., is the source for said burden, inter alia, (a) § 521(4), which provision the

Court earlier alluded to and which provision obligates the debtor to surrender recorded information to a bankruptcy trustee, (b) the debtor's obligation to comply with discovery requests related to, inter alia, actions objecting to his or her bankruptcy discharge, and/or (c) Fed.R.Bankr.P. 4005, which "rule leaves to the courts the formulation of rules governing the shift of the burden of going forward with the evidence"). Furthermore, the Court, as it concludes in the text above, does not find actionable, without more, under any paragraph of § 727(a) any failure by a debtor to satisfy, solely with respect to a creditor, any such burden to produce recorded information.

or may actually continue to retain recorded information that should have been produced by now, the Court must now deal with the aforesaid dilemma by entering the following finding of fact, to wit that PNC has proven by a preponderance of the evidence that the debtor has either concealed, or failed to keep or preserve, any and all recorded information which the Court orally directed the debtor to produce but which has not yet been produced by the debtor, with the lone exception to such finding being with respect to those banking records of the debtor which he has not yet actually produced.[5]

The Court uses three vehicles to arrive at the above finding of fact. First, the Court infers, by virtue of the debtor's failure to produce any recorded information that has not yet been produced, that it is more likely than not that the debtor simply either never kept or failed to preserve such recorded information, excepting for those banking records of the debtor which he has not yet actually produced. Second, the Court infers, by virtue of the debtor's failure to produce any recorded information that has not yet been produced but which the debtor actually retains, that it is more likely than not that the debtor concealed said recorded information, excepting for those banking records of the debtor which he has not yet actually produced. As for whether the debtor has concealed recorded information, or has merely failed to keep or preserve the same, the Court need not concern itself. *See, e.g., Nazarian*, 18 B.R. at 149 (court unable to ascertain whether debtor concealed, destroyed, or failed to keep adequate records, but his failure to provide documentation suffices for denial of discharge under § 727(a)(3)). Third, the Court enters the above finding

of fact with respect to recorded information retained by the debtor in contravention of the Court's three oral document production directives pursuant to the Court's *sua sponte* application of Fed. R.Civ.P. 37(b)(2)(A), which rule is made applicable to this proceeding pursuant to Fed.R.Bankr.P. 7037. *See* Fed.R.Bankr.P. 7037, 11 U.S.C.A. (West 1984). Fed. R.Civ.P. 37(b)(2)(A) provides, in pertinent part, that:

> If a party ... fails to obey an order to provide ... discovery, ... the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:
>
> (A) An order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order.

Fed.R.Civ.P. 37(b)(2)(A), 28 U.S.C.A. (West 1992). The Court can, and does, utilize Fed.R.Civ.P. 37(b)(2)(A) in the present instance (a) notwithstanding that it issued oral directives rather than formal orders compelling the debtor to produce documentation because the three oral directives were each (i) issued subsequent, rather than prior, to trial, and (ii) particularly addressed to the debtor's counsel, thereby providing notices to the debtor and his counsel that were at least as effective as written orders to the same effect, (b) by virtue of the Court's inherent powers and those powers bestowed upon the Court pursuant to 11 U.S.C. § 105(a), and (c) because the Court concludes that the entry of a sanction via said procedural rule is thoroughly warranted under the circum-

---

5. The Court will not enter a factual finding that the debtor has either concealed, or failed to keep or preserve, his banking records which he has not yet actually produced because the Court (a) believes that the debtor retains said records, (b) believes that the debtor's failure to produce said records is not as a result of concealment by the debtor but rather a failure by debtor's counsel to understand the Court's directive that said records be produced, and (c) concludes that the production of said records would not have any effect upon the Court's decision given that the contents of said records will possess the same shortcomings which the Court has already identified with respect to those banking records that were produced by the debtor.

stances presented herein as more fully explained in the preceding paragraphs of this section of this opinion.[6]

### C. The Debtor's Medical Practice and § 727(a)(3).

### i. PNC's Prima Facie Case.

One of the grounds upon which PNC objects to the debtor's Chapter 7 discharge under § 727(a)(3) is that, according to PNC, the debtor has not kept or preserved adequate recorded information from which one might be able to ascertain the financial condition of, or recent transactions with respect to, the debtor's medical practice. With respect to his medical practice, the debtor concedes that (a) he maintained neither a general ledger or other book of original entry (ie., cash receipts journal, accounts receivable and/or accounts payable journal, etc.) nor any type of spreadsheet summarizing his business activities and financial transactions, *see supra* p. 91, and (b) the full extent of his recordkeeping with respect to his medical practice consists of the pertinent documents that he has produced, to wit his bank checking account statements, cancelled checks, check stubs, the handwritten register paralleling checks written for a certain period

in 1997 from his Stanton account, forms that the debtor received simultaneous with payment from insurers such as Medicare and Blue Cross/Blue Shield (ie., "Explanation of Benefits" forms), and the debtor's federal income tax returns for years leading up to the commencement of the instant case. *See supra* pp. 89–90. Do the preceding documents constitute adequate recorded information for purposes of § 727(a)(3) or, posited differently, can PNC, the Court, or anyone other than the debtor himself ascertain the financial condition of, or recent transactions with respect to, the debtor's medical practice by examining the aforesaid documents? The Court, for the following reasons, answers the preceding question in the negative.

First, it is apparent to the Court that the debtor used his checking account(s) pre-petition for both business and personal purposes, *see supra* pp. 89 & 91–92, and that the debtor actually continues to maintain the same practice post-petition. *See supra* pp. 94–95. This practice of commingling business and personal transactions within the same bank account may not necessarily preclude an outsider

---

6. Entry of the instant sanction by the Court also satisfies the Third Circuit's test for propriety of the entry of such a sanction. In the Third Circuit, the propriety of a sanction order under Fed.R.Civ.P. 37(b)(2), provided that said order is not tantamount to a default judgment, is determined by balancing (a) the culpability of the party sanctioned, (b) prejudice that the party benefitting from the sanction has suffered at the hands of the sanctioned party, and (c) whether lesser sanctions would have been effective. *See Estate of Spear v. C.I.R.*, 41 F.3d 103, 111–16 (3rd Cir.1994); *In re Lands End Leasing, Inc.*, 220 B.R. 226, 231 (Bankr.D.N.J.1998). The Court concludes that the above balancing test is appropriate to use in the present instance because, even though the debtor's defense of PNC's objection to discharge is impaired by the Court's deemed factual findings, said sanction is not tantamount to a default order against the debtor given that (a) PNC, even after the entry of said sanction, still needs to establish its *prima facie* case with respect to its cause of action under § 727(a)(3), and (b)

the debtor is not otherwise precluded from defending against PNC's action. *See Spear*, 41 F.3d at 110; *Lands End Leasing*, 220 B.R. at 231. As for the three factors to be considered in applying the above balancing test, the culpability of the debtor is adequately detailed in the text immediately preceding the instant footnote. As for prejudice to PNC, (a) the *Spear* court notes that a consideration of such prejudice equates with a determination as to whether there is a substantial relationship between the sanction and the particular claim, facts, or matters that were the subject of the court order that was not obeyed, *see Spear*, 41 F.3d at 115; *Lands End Leasing*, 220 B.R. at 231, and (b) the instant sanction by the Court is unquestionably related to the matters addressed in the Court's three oral directives to the debtor. Finally, the Court concludes that lesser sanctions will not be effective in dealing with the debtor's continued failure to produce the documentation that is the subject of the facts deemed to be found via the instant sanction imposed by the Court.

from understanding the flow of transactions in and out of said account. However, if, as in the instant case, the only documents and records kept with respect to withdrawals from such an account are checking account statements, cancelled checks, check stubs, and a handwritten register, then such documentation is inadequate for purposes of § 727(a)(3) given that an outsider cannot practically distinguish therefrom between personal and business expenses that are paid out of said account. *See Shapiro,* 59 B.R. at 849–50; *Dias,* 95 B.R. at 422; *In re Levine,* 107 B.R. 781, 784 (Bankr.S.D.Fla.1989). Additionally, the debtor did not produce deposit slips or other documentation from which one can practically discern the source of funds deposited into the debtor's checking accounts. Although the Court is uncertain whether scant documentation such as deposit slips might suffice to inform an outsider adequately as to whether the sources of the funds were business or personal in nature, the Court can comfortably hold that, without any documentation pertaining to account deposits, the bank account information is simply inadequate for purposes of § 727(a)(3).

Second, the Court concludes that checking account statements, cancelled checks, and check stubs do not, in any way, adequately detail the necessity for withdrawals by the debtor from his checking accounts, particularly in the instances when checks are drawn to "cash." Without an understanding as to why withdrawals were made from the debtor's checking account, an outsider cannot properly ascertain the debtor's financial condition. Although the Court would typically expect a debtor with a professional practice similar in size to that of the instant debtor to retain invoices or other detailed documentation to support check withdrawals and, thus, to establish that said withdrawals actually represent business expenses, the instant debtor did

not produce such invoices or supporting documentation. Perhaps the debtor, in fact, does not retain anything in the way of invoices given that the debtor admits that he failed to retain sufficient documentation so as to enable himself to take certain business expense deductions on his federal income tax returns for 1992 and 1993. *See supra* p. 92. However, the Court would expect that some invoices or similar documents would be retained so as to support income tax deductions that were taken, and that said records would be retained until after the period for an audit of filed federal returns has passed.[7]

Third, and perhaps most importantly, the Court concludes that the debtor's bank records and the Explanation of Benefits forms that the debtor produced do not, in any way, permit an outsider to (a) ascertain the amount of the debtor's accounts receivable from his medical practice as of his May 30, 1997 petition filing date, or (b) verify that the debtor possessed an even $5,000 in such accounts receivable as of said date, which figure the debtor listed in his Bankruptcy Schedule B. *See supra* p. 87. The true level of, and aging information with respect to, the debtor's accounts receivable as of May 30, 1997, is particularly important in assessing the debtor's financial condition given that (a) the debtor's gross receipts from his medical practice ranged between $343,283 and $448,625 from 1989 to 1995, whereas said gross receipts in 1996 (i.e., the year prior to commencement of the instant case) totalled only $207,191, *see supra* p. 94, and (b) the level of the debtor's business expenses, rather than declining at least somewhat proportionately in 1996 as one might expect, instead remained fairly constant in 1996. *See Id.* Although the Court would once again expect the debtor to have retained documentation as of May 30, 1997, to establish not only the amount of,

---

7. With respect to the tax returns, the debtor did not actually file his federal tax returns for the years 1991–1996 until some time after the May 30, 1997 commencement date for the

instant case. The Court is sufficiently certain that the statute of limitations for an audit of said returns has not yet passed.

but also the sheer existence of, any accounts receivable as of said date, the debtor failed to produce any such documentation. Without such documentation, and without any means of ascertaining or verifying the level of such accounts receivable, the records produced by the debtor with respect to his medical practice are wholly inadequate for purposes of § 727(a)(3).

Fourth, the debtor's federal income tax returns for the years through 1996 clearly do not themselves constitute adequate documentation for purposes of § 727(a)(3) because they do not provide (a) itemization of business transactions of the debtor for any of those years, *see Goldstein,* 123 B.R. at 524–25 (Bankr.E.D.Pa.1991) (citing *In re Underhill,* 82 F.2d 258, 260 (2nd Cir.1936); *Switzer,* 55 B.R. at 995; and *In re Sherman,* 24 B.R. 507, 508 (Bankr. E.D.Pa.1982)); *Frommann,* 153 B.R. at 118 (citing *Goldstein* ), (b) information regarding the debtor's accounts receivable given that said returns were prepared on a cash basis, *see supra* p. 94, which basis of reporting obviates the need for accounts receivable information, and (c) detail with respect to either the business expense deductions taken, or the gross receipts indicated, in said returns.

Fifth, "copies of tax returns, even when prepared by an accountant from whatever records the accountant can garner from the taxpayer, are not a significant indicia of sufficient record keeping" by said taxpayer. *Goldstein,* 123 B.R. at 524–25; *Frommann,* 153 B.R. at 118 (citing *Goldstein* ); *see also Morando,* 116 B.R. at 16 ("For tax returns, the taxpayer provides information from which[,] and in reliance on the same[,] a return is prepared. Tax returns, whether filed timely or belatedly, do not require a full scale audit or even an investigation of the taxpayer's affairs."). Therefore, the debtor's federal income tax returns for the years through 1996 neither themselves constitute adequate documentation, nor evidence adequate recordkeeping by the debtor, for purposes of § 727(a)(3).

Finally, the debtor suggests that his recordkeeping with respect to his medical practice is sufficient such that PNC saw fit to extend credit of roughly $400,000 to $500,000 to the debtor, and that this particular fact evidences, or at least suggests in turn, that the same recorded information by the debtor satisfies § 727(a)(3)'s recordkeeping requirement. The Court must reject this reasoning, however, because the debtor has not established, indeed has not even alleged, that PNC ever requested to review the debtor's relevant business records when lending money to the debtor, which means that one cannot be certain as to whether PNC, at the underwriting stage, was then actually satisfied with the debtor's pertinent recordkeeping. Furthermore, even if, *arguendo,* PNC was satisfied with the state of the debtor's recordkeeping at the underwriting stage, the debtor has not established that recorded information that PNC might have considered relevant to its underwriting decisions with respect to the debtor was sufficient for other concerns of PNC, such as collection of the debtor's eventual outstanding indebtedness to PNC.

Having determined that neither PNC, the Court, nor anyone other than the debtor can ascertain the financial condition of, or recent transactions with respect to, the debtor's medical practice by examining the recorded information which the debtor produced, the Court must next address whether such failure to produce adequate documentation by the debtor makes it impossible for an outsider to ascertain said financial condition or said recent transactions which are material without organizing, reconstructing, independently investigating, and/or accepting oral representations by the debtor regarding the debtor's affairs. The Court concludes that the preceding "impossibility" test is met with respect to the debtor's medical practice because the Court finds that PNC will not be able to ascertain the financial condition of, or recent material transactions with respect

to, the debtor's medical practice unless PNC (a) organizes the documentation which the debtor actually produced, (b) reconstructs and/or independently investigates the debtor's affairs so that it can (i) make sense of the debtor's banking records, (ii) determine the sources of deposits made to the debtor's bank accounts, and (iii) discover the level of, as well as the aging of, the debtor's accounts receivable, and/or (c) accepts oral representations by the debtor so as to fill in the gaps left by the inadequacy of the debtor's written documentation.

■ Based upon all of the above, the Court concludes that PNC, with respect to the debtor's medical practice, has proven, by the necessary preponderance of the evidence, that (a) the documentation which the debtor produced is collectively inadequate for purposes of § 727(a)(3), (b) any other documentation that might have been adequate by itself, or which might have served to make adequate the documentation which the debtor ultimately produced, either has been concealed, or was not kept or preserved, by the debtor, *see supra* p. 101 (the Court's earlier finding that the debtor has either concealed, or failed to keep or preserve, any and all recorded information which the Court orally direct-

ed the debtor to produce but which has not yet been produced by the debtor), and (c) the debtor, therefore, has either concealed, or failed to keep or preserve, recorded information from which the financial condition of, or recent transactions with respect to, the debtor's medical practice might be ascertained. Because PNC has presented and proven a *prima facie* case under § 727(a)(3) with respect to documentation pertinent to the debtor's medical practice, the debtor has the burden of proving justification for the inadequacies in, or concealment of, said documentation.

### ii. The Debtor's Burden to Prove Justification.

■ With respect to justification by the debtor for the inadequacies in, or concealment of, documentation pertinent to the debtor's medical practice, the Court makes the following conclusions: [8]

(a) To the extent that the debtor has concealed documentation pertinent to the debtor's medical practice, nothing more need be said other than that no justification for said concealment exists; however, the Court notes that no explanation has been offered by the debtor for any such concealment.[9]

---

**8.** Because PNC presented and proved a *prima facie* case under § 727(a)(3) with respect to documentation pertinent to the debtor's medical practice, the burden of persuasion shifted to the debtor with respect to justification for the inadequacies in, or concealment of, said documentation. Despite the fact that the debtor is not informed until the present time that the burden of persuasion shifted to him under § 727(a)(3), the Court need not grant the debtor additional time to present evidence with respect to any justification that he might have had for the inadequacies in, or concealment of, said documentation, and the Court can thus enter findings and conclusions with respect to said justification issue at this time. The preceding determination by the Court necessarily follows because (a) the Court, prior to the present time, did not need to inform the parties that the burden of persuasion or production shifted unless the Court made a peremptory ruling in PNC's favor, such as a partial summary judgment to the effect that PNC had proven its *prima facie* case under

§ 727(a)(3), *see* 21 Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure* § 5122 (1977) (Presumptions in General in Civil Actions and Proceedings), (b) the Court neither made nor needed to make such a peremptory ruling with respect to PNC's *prima facie* case under § 727(a)(3), and (c) prior knowledge that burdens of production or persuasion have shifted thus does not, as a matter of law, affect the timing of the parties' introduction of evidence at trial. *See Id.*

**9.** The Court recognizes that (a) PNC has consistently alleged in this Court that the debtor knowingly made false statements on the Financial Statements in order to obtain loans from PNC approximating $400,000 to $500,000, and (b) such allegations by PNC, if they can be proven by the requisite standard of proof, have the potential to result in severe monetary and criminal sanctions against the debtor. *See, e.g.,* 18 U.S.C.A. § 1014 (West 1999) (false statements on bank loan applica-

(b) The debtor contends that the documents that he produced with respect to his medical practice were sufficient for his own informational needs, and that additional and more detailed records were not retained because they were not necessary to support his own needs. In support of this assertion the debtor offers an affidavit from his accountant parroting said assertion. *See supra* p. 91. Unfortunately for the debtor, this particular assertion, even if true, does not serve to justify the debtor's failure to retain documentation sufficient to satisfy § 727(a)(3). The issue of justification, of course, depends largely on what a prudent person facing circumstances similar to that of the instant debtor would do. *See supra* p. 97. The instant debtor procured financing of roughly $400,000 to $500,000 from PNC in March 1989 and then remained liable for repayment of the same throughout the period leading up to the commencement of the instant case. *See supra* p. 86. In order to procure said financing and then the continued extension of said credit, the debtor represented to PNC, via the four Financial Statements, that, *inter alia,* (i) his medical practice was worth $400,000, and (ii) said practice generated approximately $360,000 to $400,000 in annual gross income. *See supra* pp. 86–87. The Court concludes that a prudent, or normal and reasonable, person, after having made the above representations to a lender for the purpose of procuring financing of the magnitude which the instant debtor obtained, would retain recorded information sufficient to not only meet said person's own informational needs but also to satisfy the more stringent informational standards of his or her lender in the event that said lender ever requested documentation to support the aforesaid representations. The Court also concludes that a lender's informational standards would essentially mirror the recorded information which a debtor must keep and preserve in order to satisfy § 727(a)(3). Because the recorded information produced by the debtor, as explained above, is insufficient to satisfy § 727(a)(3), and since a prudent person in the debtor's circumstances would retain recorded information sufficient to satisfy § 727(a)(3) even if it were not necessary for said prudent person's own informational needs, the debtor cannot justify his failure to retain recorded information sufficient to satisfy § 727(a)(3) by merely asserting that the retention of said documentation was not necessary for his own informational needs.

(c) In a similar vein, the debtor argues that, with respect to his medical practice, he was justified in retaining only the recorded information which he ultimately produced because said recorded information is precisely identical to the universe of documentation that other professionals with similar practices re-

---

tions punishable by fine up to $1,000,000 and imprisonment up to 30 years; relevant case authority establishes that reliance of bank is immaterial to said crime); 18 U.S.C.A. § 1344 (West 1999) (bank fraud punishable by fine up to $1,000,000 and imprisonment up to 30 years; relevant case authority establishes that reliance of bank is immaterial to said crime). Unfortunately for the debtor, any possible desire on his part to avoid potential prosecution for the above crimes cannot, and does not, constitute just cause in this Court under § 727(a)(3) for any acts by the debtor to conceal recorded information. The Court is also aware that (a) the debtor divorced from his wife at some point relatively shortly prior to the commencement of the instant bankruptcy case, and (b) parties to a divorce proceeding often experience a natural reluctance to disclose information pertinent to asset holdings. Unfortunately for the debtor, any possible desire on his part to avoid disclosing to his ex-spouse information that may not previously have been, but which should have been, disclosed, cannot, and does not, constitute just cause in this Court under § 727(a)(3) for any acts by the debtor to conceal recorded information.

tain.[10] The debtor, in support of said contention, once again offers the affidavit of his accountant, wherein said accountant asserts that he represents other professionals who apparently do not retain documentation in excess of that which was produced by the instant debtor. *See supra* p. 91. The Court finds that this reasoning by the debtor has more persuasive appeal than the rationale considered in the preceding paragraph. That notwithstanding, however, the Court must reject this particular reasoning because (a) the debtor has not proven by a preponderance of the evidence, and the debtor's accountant does not assert in his affidavit, that the other professionals to whom both refer (ie., the professionals who apparently retain no more documentation than that which was produced by the instant debtor) are prudent with respect to their record-keeping practices, (b) the Court has already concluded that a prudent person in the debtor's circumstances would retain recorded information far in excess of that which the debtor produced (ie., information sufficient to satisfy § 727(a)(3)), and (c) neither the debtor nor his accountant have demonstrated to the Court that the other professionals with similar practices to whom the debtor and his accountant refer also made representations to a lender such as did the debtor for the purpose of procuring financing of the magnitude which the instant debtor obtained.

(d) The debtor testified and/or his counsel represented generally that (i) some of his records were either lost, stolen, or mixed up, (ii) his office had been bur-

glarized twice within a seven- or eight-month period, (iii) he had moved several times in the past few years, and (iv) he had misplaced documentation as a result of the moves. *See supra* p. 94. To the extent that the substance of the preceding testimony was offered by the debtor as a justification for his failure to preserve adequate documentation pertinent to his medical practice, the Court, for several reasons, rejects said offer. First, the debtor's allegations of burglary, to which the debtor failed to make any mention in answer to questions 8 and 17c within his Statement of Financial Affairs, *see supra* p. 94, were not corroborated by the debtor with evidence such as a copy of a police report or an insurance claim. Consequently, loss of recorded information by the debtor due to theft has not been established by the requisite preponderance of the evidence, which means that it cannot be accepted by the Court as a justification for failure to preserve documentation. Second, the fact that the debtor has geographically moved on one or several occasions does not, by itself, provide any justification for the loss of recorded information such as the debtor's business records given that a prudent person would take proper precautions to ensure against such loss. Therefore, if any documentation was lost during geographical moves by the debtor and the debtor wished to offer a justification for such loss, the debtor needed to demonstrate to the Court that such loss occurred for a reason other than the debtor's mere failure to take proper precautions against such loss.[11] Unfortunately for the debtor, he has

10. Given the debtor's medical practice and his luxurious lifestyle pre-petition as evidenced by, *inter alia,* his Ferrari collection and the Florida Realty interest, the debtor cannot successfully contend, and he does not suggest, that his bankruptcy case is similar to that of a typical consumer, whom one might expect would not maintain and retain numerous and detailed records.

11. The Court, of course, cannot accept as a justification for the debtor's loss of documents that said loss occurred because of theft or geographical moves accompanied by proper precautions unless the debtor can prove that (a) said theft occurred, or (b) said proper precautions were taken. Were the Court to merely accept said explanations without proof

not even addressed whether, let alone proven by a preponderance of the evidence that, any such loss of recorded information occurred for a reason other than the debtor's failure to take proper precautions, which means that geographical moves by the debtor provide nothing in the way of justification for any loss of business records. Third, that the debtor merely misplaced, rather than lost, documentation as a result of geographically moving addresses not the failure to preserve, but rather the failure to produce, recorded information. As set forth in part B of this section of the instant opinion, this particular justification for failing to produce recorded information was accepted by the Court such that the Court afforded to the debtor an additional period of time to locate said documentation; however, since the documentation alleged to have been misplaced was not ever produced, the Court found that it was either concealed, or never kept or not preserved, which means that the debtor must provide justification therefor. Finally, the debtor's counsel represented to the Court, and the debtor's accountant implicitly stated via his affidavit, that everything which was produced relative to the debtor's medical practice constituted the universe of the debtor's business records. *See supra* pp. 90 & 91. Said assertions, if they are actually correct, are tantamount to an admission that none of the debtor's business records were actually stolen or lost, which would mean that theft or loss cannot constitute a justification for the overall inadequacy of the debtor's recorded information.

In light of all of the above, the Court concludes that the debtor has not justified his concealment of, and/or failure to keep or preserve, recorded information from which the financial condition of, or recent transactions with respect to, his medical practice might be ascertained. Because the Court concludes that the debtor has not provided the Court with the preceding justification, the Court will sustain PNC's objection under § 727(a)(3) to, and consequently will deny entry of, the debtor's Chapter 7 discharge.

### D. *The Debtor's Nonbusiness Assets and § 727(a)(3).*

#### i. *PNC's Prima Facie Case.*

PNC also objects to the debtor's Chapter 7 discharge under § 727(a)(3) on the basis that the debtor failed to keep or preserve adequate recorded information from which one might be able to ascertain the debtor's financial condition with respect to the Florida Realty interest, the debtor's Ferrari collection, the debtor's art collection, and the debtor's rare wine collection.

With respect to the above nonbusiness assets, the debtor produced the following:

(a) Regarding the Florida Realty interest, the debtor produced nothing other than a copy of the June 9, 1980 Sales Agreement, wherein the debtor is named as a purchaser of an interest in the Florida Realty on what appears to be an installment sale basis. *See supra* p. 89.

(b) Regarding the Ferrari collection, the debtor produced nothing other than (i) the Spangler letter, (ii) the Glasso affidavit, (iii) a copy of the June 6, 1996 Agreement of Loan/Sale, and (iv) copies of two cashier's checks used by the debtor to purchase the 1967 and 1971 Ferraris. *See supra* pp. 89–90.

(c) The debtor produced nothing in the way of recorded information with respect to either his art or rare wine collections. *See supra* p. 91.

as justification under § 727(a)(3), then a debtor could, for instance, deposit all or nearly all of his or her recorded information in the trash just prior to the filing of a bankruptcy petition and said debtor would still escape the burdens imposed by § 727(a)(3).

Does the preceding recorded information constitute adequate recorded information with respect to the debtor's nonbusiness assets for purposes of § 727(a)(3) or, posited differently, can PNC, the Court, or anyone other than the debtor himself ascertain the debtor's financial condition with respect to said nonbusiness assets by examining the aforesaid documentation? The Court, for numerous reasons, answers the preceding question in the negative.

With respect to the June 9, 1980 Sales Agreement, even though the debtor is named therein as an installment purchaser of an interest in the Florida Realty, said sales agreement, by itself, does not establish that the debtor actually ever owned an interest in said realty given that said sales agreement does not, in any way, evidence whether the debtor ever consummated, either partially or otherwise, the transaction described in said sales agreement (ie., whether the debtor ever provided any part of the consideration set forth in the June 9, 1980 Sales Agreement so as to effect a future change in ownership of the Florida Realty). *See* Ex. A to Oct. 4, 1999 Deb. Status Rep. Additionally, the debtor testified that he transferred his ownership interest in the Florida Realty in either late 1995 or early to mid–1996. *See supra* p. 92. However, an outsider most certainly cannot ascertain, merely from examining the June 9, 1980 Sales Agreement, (a) whether the debtor actually transferred any ownership interest that he possessed in the Florida Realty, (b) the date of any such transfer, or (c) the consideration received by the debtor as a result of any such transfer. *See* Ex. A to Oct. 4, 1999 Deb. Status Rep. Therefore, the June 9,

1980 Sales Agreement, by itself, cannot constitute adequate recorded information for purposes of § 727(a)(3).[12]

As for the Spangler letter, the Court concludes that said letter constitutes recorded information within the meaning of § 727(a)(3) because it is in written form and it describes several past transactions regarding the debtor's Ferrari collection. However, the Spangler letter, by itself, does not constitute adequate documentation of the transactions that are discussed therein for several reasons. First, the precise contents of the Spangler letter, to the extent that they are offered as evidence in court by the debtor to prove the truth of the matters asserted, constitute inadmissible hearsay. *See infra* pp. 123–24. That being the case, the contents of said letter, even when only offered as the contents of a piece of recorded information to satisfy the debtor's recordkeeping requirements under § 727(a)(3), nevertheless raise many of the same concerns that are encountered when considering for admissibility as evidence statements which constitute inadmissible hearsay, to wit (a) sincerity issues regarding the author of the Spangler letter (ie., whether Spangler had any motive to, and then did, deceive within the letter), (b) narration and/or ambiguity problems with respect to the language that Spangler utilized to convey his recounting of the transactions described in the Spangler letter (e.g., when Spangler says that he "arranged for a trade of" the Ferrari 330 GT 2+2, is he also asserting that he participated in the actual execution of the trade), and (c) whether Spangler accurately remembers the transactions described in said letter, especially given that Span-

---

**12.** Because the debtor essentially estimated that his one-half ownership interest in the Florida Realty was worth at least $125,000 up until his alleged disposition of said property interest, *see infra* p. 119, and since a $125,000 asset is material to all concerned with the administration of the debtor's bankruptcy estate, PNC and the remainder of the creditor body now have a legitimate interest in obtaining adequate recorded information regarding the Florida Realty interest, and the conceal-

ment or failure to keep or preserve said information is thus actionable under § 727(a)(3), notwithstanding the Court's earlier finding in the February 25, 1999 Opinion that, for purposes of PNC's § 523(a)(2) nondischargeability action, PNC neither actually nor reasonably relied upon the debtor's representations regarding said realty interest when PNC extended credit to the debtor. *See* Feb. 25, 1999 Opinion, at 40–43.

gler drafted said letter on June 17, 1999, which date is subsequent to the transactions described therein by, respectively, approximately nine years and three years. Because of these hearsay-type concerns, the Spangler letter is not reliable enough such that it can constitute, by itself, adequate documentation of the matters described within said letter. Second, a concern for the authenticity of the Spangler letter arises given that said letter is neither notarized nor accompanied by a seal, and was neither drafted nor produced until subsequent to (a) the commencement of the instant bankruptcy case, as well as PNC's objection to discharge, (b) PNC's formal document production requests, and (c) the Court's first oral directive to the debtor to produce documents and records. Because of the preceding authenticity concern, the Spangler letter is not reliable enough such that it can constitute, by itself, adequate documentation of the matters described within said letter.[13] Third, Spangler does not address within his letter, *inter alia*, (a) whether the transactions described within the letter were ever actually and completely consummated, (b) whether the Ferrari 330 GT 2+2, the 512 TestaRossa Ferrari, and/or the 400 SA Cabriolet Ferrari were ever encumbered and, if so, to what extent, (c) the ultimate disposition of the 512 TestaRossa Ferrari, which automobile the debtor contends was sold in 1995 with the proceeds going to Northside Bank, and (d) what the debtor did with the $75,000 in proceeds from the April 1996 sale of the 400 SA Cabriolet Ferrari. *See* Ex. B to Oct. 4, 1999 Deb. Status Rep. Because the Spangler letter does not address the above matters, and since said matters are unquestionably material to an outsider attempting to ascertain the debtor's true holdings with respect to said vehicles, said letter, by itself, cannot possibly constitute adequate documentation with respect to the vehicles referred to in said letter.

With respect to the Glasso affidavit, which affidavit constitutes recorded information within the meaning of § 727(a)(3) for the same reasons as does the Spangler

13. The Court, by an Order dated November 30, 1999, denied without prejudice PNC's objection of the admission into evidence of, or motion to strike from the record, *inter alia*, the Spangler letter. *See* Nov. 30, 1999 Order. However, the Court, by virtue of taking such action, did not thereby intend to indicate that it viewed as unfounded the grounds for PNC's evidentiary objections. Instead, the Court admitted into evidence the various documents at issue, including the Spangler letter, with the recognition that such admission is appropriate in the absence of a jury, and regardless of whether said documents might not otherwise be admissible in the presence of a jury, given that the Court, as fact-finder, is free to consider the various concerns regarding such evidence that are raised by PNC's evidentiary objections. Indeed, the Court, in its capacity as fact-finder, is obligated to, and thus shall, consider any concerns that the Court identifies with respect to admitted evidence regardless of whether objections have been raised to the admission of said evidence. In its capacity as fact-finder, the Court is obligated to, and thus shall, take note of (a) the obvious hearsay nature of the contents of the Spangler letter and the Glasso affidavit to the extent that said documents are offered by the debtor to corroborate testimony under § 727(a)(5), *see infra* pp. 123–24, (b) the fact that the contents of said documents, for purposes of § 727(a)(5), constitute not only hearsay but, moreover, inadmissible hearsay under the Federal Rules of Evidence, *see Id.*, (c) the attendant hearsay concerns encountered when considering said documents, *see supra* pp. 109–10 and *infra* p. 111, (d) the similar hearsay-type concerns that are encountered when considering the adequacy of said documents for purposes of § 727(a)(3), *see supra* pp. 109–10 and *infra* p. 111, and (e) the authenticity concerns surrounding the Spangler letter and the June 6, 1996 Agreement of Loan/Sale, *see supra* pp. 109–10 and *infra* p. 111. The Court also wishes to point out that, by directing the debtor to produce pertinent documentation obtainable from a source other than himself as a possible alternative for the production of documentation that he possessed, *see infra* note 15 (reference to 5/3/99 Tr. at p. 35, li. 24—p. 36, li. 7), the Court did not thereby also (a) approve of the production by the debtor of documentation which is tainted by hearsay and authenticity concerns, or (b) inoculate, or intend to inoculate, from such hearsay and authenticity concerns any documentation which was ultimately produced by the debtor.

letter, the Court notes that said affidavit is accompanied by each of the hearsay-type concerns which the Spangler letter raises (ie., sincerity of the affiant, narration and/or ambiguity problems regarding language used by affiant, and memory problems of the affiant). *See supra* pp. 109–10 and note 13. Therefore, the Glasso affidavit, by itself, is not reliable enough such that it can constitute, by itself, adequate documentation of the matters described therein. However, the debtor, in addition to producing the Glasso affidavit, also produced (a) a copy of the June 6, 1996 Agreement of Loan/Sale, and (b) copies of two cashier's checks used by the debtor to purchase the 1967 and 1971 Ferraris. *See supra* p. 90. These additional documents are certainly of the type that would typically act to substantially neutralize the hearsay concerns of the Glasso affidavit with respect to issues commonly addressed by both the additional documents and the affidavit. Unfortunately for the debtor, a concern for the authenticity of the June 6, 1996 Agreement of Loan/Sale arises because (a) said document is neither notarized nor accompanied by a seal, (b) said document was not produced by the debtor until subsequent to (i) the commencement of the instant bankruptcy case, as well as PNC's objection to discharge, (ii) PNC's formal document production requests, and (iii) the Court's first oral directive to the debtor to produce documents and records, and (c) of the somewhat strange term contained in said document to the effect that, if the debtor failed to repay the borrowed funds to Glasso by August 6, 1996, then the June 6, 1996 Agreement of Loan/Sale "w[ould] be considered a sale of both vehicles [by the debtor] to ... Glasso" (ie., what purpose does this term serve to ei-

ther the debtor or Glasso outside of the bankruptcy context, which context did not exist when said document is purported to have been drafted?). *See supra* p. 90; *see also supra* note 13. Furthermore, and more obviously, neither the June 6, 1996 Agreement of Loan/Sale nor the two cashier's checks addresses, *inter alia*, (a) whether the debtor ever paid all or any portion of his obligation to Glasso as set forth in the June 6, 1996 Agreement of Loan/Sale, (b) when Glasso took physical possession of the 1967 and 1971 Ferraris from the debtor, and (c) when, if ever, title to the 1967 and 1971 Ferraris was transferred to Glasso. *See* Ex. C to Oct. 4, 1999 Deb. Status Rep. Because these three particular issues are unquestionably material to an outsider attempting to ascertain the debtor's true holdings with respect to said vehicles,[14] and since neither the June 6, 1996 Agreement of Loan/Sale nor the two cashier's checks addresses the three preceding issues, none of these additional documents acts to neutralize the unreliability of the Glasso affidavit even (a) presuming, *arguendo*, that one can even glean from said affidavit answers to the aforesaid issues, and (b) if one were to overlook the aforesaid authenticity concern regarding the June 6, 1996 Agreement of Loan/Sale. In light of all of the above, the Court is constrained to conclude that the produced documentation with respect to the 1967 and 1971 Ferraris is inadequate for purposes of § 727(a)(3).

In addition to the inadequacies of the recorded information produced with respect to the Ferraris that were the subject of the Spangler letter and the Glasso affidavit, the debtor has not produced any recorded information with respect to any

14. Resolving whether the debtor ever paid any portion of his obligation to Glasso is important because said issue bears upon whether (a) the debtor received fair consideration in return for the alleged transfer of the 1967 and 1971 Ferraris to Glasso, and (b) a fraudulent conveyance consequently may have occurred with respect to said vehicles. A resolution as to when Glasso took physical possession from the debtor of the 1967 and 1971 Ferraris, and when, if ever, title to the 1967 and 1971 Ferraris was transferred to Glasso, is important because said issues bear upon whether the transfer of said vehicles to Glasso may be avoided (a) as preferential pursuant to 11 U.S.C. § 547(b), and/or (b) pursuant to the trustee's strong arm powers under 11 U.S.C. § 544.

of the other Ferraris that he owned prior to the commencement of the instant bankruptcy case and, in particular, data that would allow an outsider to test the veracity of the debtor's representations in the four Financial Statements that, at the time of said representations, he owned a collection of Ferraris valued at between $2,500,000 and $4,000,000. Therefore, the Court must conclude that the debtor has not produced documentation with respect to the remainder of his Ferrari collection that is adequate for purposes of § 727(a)(3).

As for the debtor's art and rare wine collections, the debtor has not produced anything in the way of recorded information. Of course, the Court does not venture out on a very long limb by concluding that zero produced documentation (a) does not allow an outsider to ascertain the debtor's financial condition with respect to said nonbusiness assets, and (b) is entirely inadequate for purposes of § 727(a)(3).

■ Having determined that neither PNC, the Court, nor anyone other than the debtor can ascertain the debtor's financial condition with respect to the debtor's nonbusiness assets by examining the recorded information which the debtor produced, the Court must next address whether such failure by the debtor to produce adequate documentation makes it impossible for an outsider to ascertain the

debtor's financial condition with respect to said nonbusiness assets without organizing, reconstructing, independently investigating, and/or accepting oral representations by the debtor regarding said assets. The Court concludes that the preceding "impossibility" test is met with respect to each of the debtor's nonbusiness assets because the Court finds that PNC will not be able to ascertain the debtor's financial condition with respect to said assets unless PNC (a) reconstructs and/or independently investigates [15] various ownership issues surrounding, and transactions involving, said assets, and/or (b) accepts oral representations by the debtor so as to fill in the gaps left by the inadequacy of the debtor's written documentation.

■ Based upon all of the above, the Court concludes that PNC, with respect to the debtor's nonbusiness assets, has proven, by the necessary preponderance of the evidence, that (a) the documentation which the debtor produced with respect to said nonbusiness assets is entirely inadequate for purposes of § 727(a)(3), (b) any other documentation that might have been adequate by itself, or which might have served to make adequate the documentation which the debtor produced, either has been concealed, or was not kept or preserved, by the debtor, *see supra* p. 101 (the Court's earlier finding that the debtor has either concealed, or failed to keep or

**15.** The debtor's present counsel appears to mistakenly presume that (a) his client can prevail under § 727(a)(3) and (5) by merely providing PNC with sources so that PNC can then track down documentation itself, and (b) the Court ruled that the debtor can so prevail by virtue of the Court's directive to the debtor's then counsel, given at trial on May 3, 1999, that the debtor would "either have to produce or give ... [the debtor's counsel] a source for producing documentation for all of this stuff." *See* Nov. 1, 1999 Deb. Resp. to Pl. Letter, etc., at ¶ 12 (referring to preceding Court directive, taken from 5/3/99 Tr. at p. 35, li. 24—p. 36, li. 7); Nov. 23, 1999 Deb. Resp. in Opp. to Pl. Motion to Strike, etc., at ¶ 20. Unfortunately for the debtor and his present counsel, the Court, when providing the preceding directive, most certainly did not rule, nor did it intend to imply, that the debtor

could prevail under § 727(a)(3) or, for that matter, § 727(a)(5), by merely providing PNC with sources so that PNC could then track down documentation itself. In fact, and of course, the Court could not, consistent with the foregoing body of case authority, *see supra* p. 97, have given such a direction to the debtor's counsel. Instead, the proper construction of the preceding direction by the Court-and the construction which the debtor's counsel must be held to given that said counsel is charged with knowledge of the pertinent law-is that the debtor would have to either (a) produce sufficient documentation with respect to the assets in question, or (b) supply his counsel with a source from which said counsel could then procure said documentation himself, after which said documentation would then need to be provided to PNC.

preserve, any and all recorded information which the Court orally directed the debtor to produce but which has not yet been produced by the debtor), and (c) the debtor, therefore, has either concealed, or failed to keep or preserve, recorded information from which the debtor's financial condition with respect to his nonbusiness assets might be ascertained. Because PNC has presented and proven a *prima facie* case under § 727(a)(3) with respect to documentation pertinent to the debtor's nonbusiness assets, the debtor has the burden of proving justification for the inadequacies in, or concealment of, said documentation.

### ii. *The Debtor's Burden to Prove Justification.*

▮ With respect to justification by the debtor for the inadequacies in, or concealment of, documentation pertinent to his nonbusiness assets, the Court makes the following conclusions, several of which are similar in nature to those drawn with respect to justification and documentation pertinent to the debtor's medical practice: [16]

(a) Even if the scant or-with respect to certain assets—nonexistent documentation produced by the debtor regarding his nonbusiness assets sufficed to satisfy the debtor's own informational needs, that fact cannot justify failing to preserve recorded information sufficient to satisfy § 727(a)(3) if a prudent person facing circumstances similar to that of the instant debtor would retain such information. *See supra* p. 97.

The debtor procured the aforesaid $400,00 to $500,000 in financing from PNC, as well as the continued extension of said credit, by representing to PNC, via the four Financial Statements, that, *inter alia,* he owned (i) an interest in the Florida Realty, which home was worth between $250,000 and $350,000, (ii) a collection of Ferraris valued at between $2,500,000 and $4,000,000, and (iii) collections of art and rare wine valued respectively at up to $100,000 and $90,000. *See supra* pp. 86–87. The Court concludes that a prudent person, after having made the above representations to a lender for the purpose of procuring financing of the magnitude which the instant debtor obtained, would retain recorded information sufficient to not only meet said person's own informational needs but also to satisfy the more stringent informational standards of his or her lender in the event that said lender ever requested documentation to support the aforesaid representations. The Court also concludes that a lender's informational standards would essentially mirror the recorded information which a debtor must keep and preserve in order to satisfy § 727(a)(3). Because the recorded information produced by the debtor, as explained above, is insufficient to satisfy § 727(a)(3), and since a prudent person in the debtor's circumstances would retain recorded information sufficient to satisfy § 727(a)(3) even if it were not necessary for said prudent person's own informational needs, the debtor cannot justify his

---

**16.** As was the case with respect to documentation pertinent to the debtor's medical practice, PNC presented and proved a *prima facie* case under § 727(a)(3) with respect to documentation pertinent to the debtor's nonbusiness assets, which means that the burden of persuasion shifted to the debtor with respect to justification for the inadequacies in, or concealment of, said documentation. Despite the fact that the debtor is not informed until the present time that the burden of persuasion shifted to him under § 727(a)(3), the Court, for the reasons set forth in footnote 8 herein, need not grant the debtor additional time to present evidence with respect to any justification that he might have had for the inadequacies in, or concealment of, said documentation, and the Court can thus enter findings and conclusions with respect to said justification issue at this time. *See supra* note 8 (preceding determination follows because prior knowledge that burdens of production or persuasion have shifted does not, as a matter of law, affect the timing of the parties' introduction of evidence at trial).

failure to retain recorded information sufficient to satisfy § 727(a)(3) by merely asserting that the retention of said documentation was not necessary for his own informational needs.

(b) The debtor appears to argue, at least implicitly, that he did not need to retain information more adequate than that which he produced with respect to his nonbusiness assets because such additional documentation *per se* is not required to be kept with respect to assets that are not business in nature. Although the Court is aware of two cases that may be cited for the proposition just described, *see In re Brown,* 194 B.R. 514, 520 (D.Kan.1996), *aff'd,* 108 F.3d 1290, 1295 (10th Cir.1997); *In re Ramos,* 8 B.R. 490, 497 (Bankr. W.D.Wis.1981), the *Brown* decision actually does not stand for such a broad proposition, *see Brown,* 194 B.R. at 514 (reversing a denial of discharge on the ground that records were not kept of assets owned as a hobby not because assets were nonbusiness in nature but because transactions in such nonbusiness assets did not typically generate written documentation), and the Court disagrees with, and thus will not follow, the particular ruling in *Ramos.* Instead, the Court agrees with, and thus follows, the rationale in *Brown* and other decisions which applies the prudent person standard to the issue of justification for a failure to keep or preserve adequate recorded information regarding nonbusiness assets. *See In re Sharpe,* 16 B.R. 226, 228 (Bankr.S.D.Fla.1981) (records of sales of art objects collected as a hobby must be kept and preserved if sales proceeds invested in business); *Morando,* 116 B.R. at 16–17 (records must be kept and preserved regarding ownership and transfer of residence, other realty, stock certificates, and a coin collection valued at $55,000, as well as documentation substantiating the loan of $210,000 in funds to others); *Pulos,*

168 B.R. at 691 (debtors must keep, preserve, and produce documentation regarding snowmobiles, fur coats, and expensive jewelry given that said assets garnered $40,000 in sales proceeds, and debtors must do the same with respect to documentation concerning their mortgaged homestead given that "[t]hese are basic records [that] any person would keep"). Therefore, the debtor must retain recorded information regarding his nonbusiness assets sufficient to satisfy § 727(a)(3) if a prudent person facing circumstances similar to that of the debtor would do so. As explained in the preceding paragraph, the Court concludes that (i) a prudent person facing circumstances similar to that of the debtor would retain recorded information regarding his nonbusiness assets sufficient to satisfy § 727(a)(3), and (ii) the debtor failed to retain such recorded information.

(c) The debtor cannot succeed in contending, as a justification for his failure to preserve adequate recorded information pertinent to his nonbusiness assets, that, as of his May 30, 1997 petition filing date, the debtor no longer owned any of the nonbusiness assets which have been discussed above because (i) an outsider, without such recorded information, will be left to speculate as to whether the debtor has been truthful regarding the extent of his nonbusiness asset holdings as of the petition filing date, which hopeless situation for an outsider, of course, is not acceptable under § 727(a)(3), *see supra* p. 97, and (ii) a prudent person facing circumstances similar to that of the debtor would retain such recorded information. The debtor also cannot successfully advance as a justification for his failure to preserve such recorded information that, as of May 30, 1997, the alleged transfers of many of his nonbusiness assets had occurred so far in the past such that an inquiry into

said transfers would now be unreasonable under § 727(a)(3) because (i) an outsider, without such recorded information, cannot ascertain whether said transfers ever occurred, let alone whether they occurred sufficiently far into the past so as to escape scrutiny under § 727(a)(3), (ii) the debtor testified, with respect to the Florida Realty interest, that he did not divest himself of said realty interest until sometime within one and one-half (1½) years prior to May 30, 1997, *see supra* p. 92, which period is not too far prior to bankruptcy so as to escape scrutiny, (iii) the debtor testified that, with respect to all of the Ferraris that have been discussed within this particular section of this opinion other than the Ferrari 330 GT 2+2, said Ferraris were transferred no earlier than the autumn of 1995, *see supra* pp. 93–94, which date is within two years of the debtor's petition filing date and, thus, not too far prior to bankruptcy such that said transfers can escape scrutiny, and (iv) the December 2, 1996 Pa. D.M.V. record search raises genuine doubt as to whether the debtor ever transferred ownership of, *inter alia*, the Ferrari 330 GT 2+2.

(d) Having concluded that the debtor needed to retain and produce documentation regarding his nonbusiness assets far in excess of that which the debtor produced (ie., information sufficient to satisfy § 727(a)(3)), the Court can also conclude summarily that the debtor did not have any justification for concealing any recorded information pertinent to his nonbusiness assets, which recorded information might have served to satisfy his recordkeeping responsibility under § 727(a)(3). *See also supra* note 9.

(e) As for the debtor's testimony that some of his recorded information was either lost, stolen, or misplaced, the Court concludes for several reasons that the substance of said testimony does not constitute a justification for the debtor's failure to preserve adequate documentation pertinent to his nonbusiness assets. First, and as previously explained, the debtor's allegations of burglary are both unsubstantiated and inconsistent with representations made in his Statement of Financial Affairs. *See supra* p. 107. Consequently, the loss of any recorded information by the debtor due to theft has not been established by a preponderance of the evidence, which means that it cannot be accepted by the Court as a justification for failure to preserve any documentation pertinent to the debtor's business or nonbusiness assets. Moreover, even if the debtor had proven that the alleged burglaries occurred, that fact would not establish, by itself, that recorded information pertinent to the debtor's nonbusiness assets thereby had been lost given that (a) the alleged burglaries were of the debtor's business premises rather than his personal residence, *see supra* p. 94, (b) the debtor never asserted, much less established, that his nonbusiness records were kept at his place of business, and (c) burglaries, in any event, do not typically result in the theft of documents. Second, and as also explained above, (i) the fact that the debtor has geographically moved on one or several occasions does not, by itself, provide any justification for the loss of any recorded information, (ii) if any documentation was lost during geographical moves by the debtor and the debtor wished to offer a justification for such loss, the debtor needed to demonstrate to the Court that such loss occurred for a reason other than the debtor's mere failure to take proper precautions against such loss, and (iii) the debtor has not proven by a preponderance of the evidence that any such loss of recorded information, whether it be with respect to his business or nonbusiness assets, occurred

for a reason other than the debtor's failure to take proper precautions. *See supra* p. 107 and note 11. Consequently, geographical moves by the debtor provide nothing in the way of justification for any loss of records that pertain to his nonbusiness assets. Third, and as also explained above, that the debtor merely misplaced, rather than lost, documentation as a result of moving does not even address, much less justify, a failure to preserve said documents. *See supra* p. 107. Finally, the debtor necessarily cannot advance theft and geographical moves as a justification for his failure to produce those documents pertinent to his nonbusiness assets which he has testified that he both retains and has located (ie., the three pieces of recorded information described on p. 99 of the instant opinion at ¶ g).

In light of all of the above, the Court concludes that the debtor has not justified his concealment of, and/or failure to keep or preserve, recorded information from which one can ascertain his financial condition with respect to his nonbusiness assets. On the basis of the debtor's failure to provide the Court with the preceding justification, the Court will sustain PNC's objection under § 727(a)(3) to, and consequently will deny entry of, the debtor's Chapter 7 discharge.

**II. *Application of § 727(a)(5) to the Facts in the Instant Case.***

**A. *Law Pertinent to § 727(a)(5).***

 "11 U.S.C. § 727(a)(5) is designed to work in tandem with § 727(a)(3), to foster the same process of investigation and disclosure [promoted by § 727(a)(3)], by requiring a debtor to give a satisfactory explanation of his insolvency, after the commencement of the bankruptcy case." *In re Johnson,* 80 B.R. 953, 960 n. 8

(Bankr.D.Minn.1987). "Under this section of the Code, the plaintiff has the initial burden of identifying the assets in question by appropriate allegations in the complaint and showing that the debtor at one time had the assets but they are no longer available for the debtor's creditors." *In re Potter,* 88 B.R. 843, 849 (Bankr.N.D.Ill. 1988). This initial burden of a plaintiff is met, or stated differently,

> [a] *prima facie* case [under § 727(a)(5)] has been held to exist[,] where a creditor shows that a debtor has listed assets in his schedules at a lower figure than he has previously presented himself to be worth, or where there was an unusual and unexplained disappearance of assets shortly before the debtor filed bankruptcy.

*In re Walton,* 103 B.R. 151, 155 (Bankr. S.D.Ohio 1989) (citations omitted). As is the case with respect to an action under § 727(a)(3), "[t]here is no requirement that a debtor act fraudulently or intentionally in order for a plaintiff to sustain objections to discharge based upon § 727(a)(5)." *Carter,* 236 B.R. at 180.

 "Once the creditor has introduced some evidence of the disappearance of substantial assets, the burden shifts to the debtor to explain satisfactorily the losses or deficiencies." *Potter,* 88 B.R. at 849 (citing *In re Martin,* 698 F.2d 883 (7th Cir.1983)). The aforesaid burden that is shifted from an objecting creditor to a debtor under the preceding circumstances is only that of production (ie., going forward with evidence); therefore, the burden of persuasion under § 727(a)(5) remains with the objecting party. *See Farouki v. Emirates Bank International, Ltd.,* 14 F.3d 244, 249 & n. 16 (4th Cir. 1994); *In re Brooks,* 58 B.R. 462, 464 (Bankr.W.D.Pa.1986); *but see Carter,* 236 B.R. at 180 (citing *In re Poland,* 222 B.R. 374, 379 (Bankr.M.D.Fla.1998)).[17] An objecting creditor's burden of persuasion un-

17. As explained earlier, the burden of persuasion shifts under § 727(a)(3) if an objecting creditor meets its initial burden, or presents a

*prima facie* case, under § 727(a)(3). *See supra* pp. 95–96.

der § 727(a)(5) is, as with § 727(a)(3), by a preponderance of the evidence. *See Ishkhanian,* 210 B.R. at 949; *Blanchard,* 201 B.R. at 114; *Maletta,* 159 B.R. at 111; *Carter,* 236 B.R. at 180; *Kisberg,* 150 B.R. at 356.

"What constitutes a 'satisfactory' explanation [on a debtor's part] is left to the discretion of the Court." *Potter,* 88 B.R. at 849. However, "[t]o be satisfactory, an explanation must convince the judge." *In re Chalik,* 748 F.2d 616, 619 (11th Cir.1984). Some courts have held that "it is not necessary in all proceedings under § 727(a)(5) [for a debtor] to produce corroborating papers, where the debtor's testimonial explanation is sufficiently credible." *Losinski,* 80 B.R. at 470; *see also In re Mitchell,* 74 B.R. 457, 461–62 (Bankr. D.N.H.1987) (same). However, the majority of courts disagree with the preceding position and hold instead, for instance, that (a) "[a] creditor is not required to rely on a debtor's [mere] statement that he no longer has certain assets," *Walton,* 103 B.R. at 155 (citing *Shapiro,* 59 B.R. at 848), (b) a "debtor's explanation must consist of more than [a] vague[,] indefinite[,] and uncorroborated hodgepodge of financial transactions," *Potter,* 88 B.R. at 849 (citing *In re Baum,* 359 F.2d 811, 814 (7th Cir.1966)), (c) "[e]xplanations consisting of mere generalities and founded upon nothing by way of verification or affirmation in books, records or otherwise is not satisfactory," *Walton,* 103 B.R. at 155 (citing *In re Hacker,* 90 B.R. 994, 996–97 (Bankr.W.D.Mo.1987); *In re Moore,* 89 B.R. 935, 937 (Bankr.

M.D.Fla.1988)), and (d) "[v]ague and indefinite explanations of losses that are based upon estimates uncorroborated by documentation are unsatisfactory." *Chalik,* 748 F.2d at 619. Reconciling all of the above, this Court holds that a debtor's testimonial explanation, by itself, potentially may suffice to satisfy the debtor's burden under § 727(a)(5) if it is convincing to the Court; however, if said testimonial explanation is, by itself, not convincing to the Court, then the debtor, in order to carry his or her burden under § 727(a)(5) and prevail thereunder, must come forward with sufficient corroboration in the form of documentation or independent testimony [18] that will convince the Court.

As is the case with respect to an inquiry under § 727(a)(3), there is not a hard-and-fast rule that limits the inquiry under § 727(a)(5) to events and transactions which have occurred within a specific number of months or years before the bankruptcy case. *See supra* p. 96 (quoting from *Losinski,* 80 B.R. at 472). When deciding whether a debtor's explanation is satisfactory for purposes of § 727(a)(5), "[t]he court need only decide whether the explanation satisfactorily describes what happened to the assets, not whether what happened to the assets was proper." *In re Nye,* 64 B.R. 759, 762 (Bankr.E.D.N.C. 1986); *see also In re Silverstein,* 151 B.R. 657, 663 (Bankr.E.D.N.Y.1993) (same); *Maletta,* 159 B.R. at 116 (same).

---

**18.** Although it appears that many courts require corroboration of a debtor's testimonial explanation to come in the form of documentation in order for a debtor to prevail under § 727(a)(5), *see, e.g., Delancey,* 58 B.R. at 769, such corroboration in the form of independent testimony is permitted by other courts. *See Maletta,* 159 B.R. at 116; *In re Turpin,* 142 B.R. 491, 496 (Bankr.M.D.Fla.1992); *In re Davison,* 73 B.R. 726, 730 (Bankr.W.D.Mo. 1987). Because the plain language of § 727(a)(5) offers nothing to preclude a debtor from corroborating his testimony with independent testimony of another, and since this Court is unaware of any reason *per se* why independent testimony cannot be accepted as such corroboration, this Court concludes that independent testimony potentially may suffice, and thus may be introduced, to satisfy a debtor's duty to corroborate his explanation under § 727(a)(5). Of course, independent testimony that is itself "general and conclusionary and not supported by any documentation" will not, by itself, likely be sufficiently convincing to a court. *See Davison,* 73 B.R. at 730. Furthermore, and as at least one court has recognized, a lack of documentation might operate to destroy the credibility of a debtor's explanation. *See Mitchell,* 74 B.R. at 462.

 In contrast to § 727(a)(3), under which a debtor can potentially prevail if he or she provides to the Court a justification for, *inter alia*, his or her failure to keep or preserve adequate recorded information, the plain language of § 727(a)(5) makes clear that a debtor cannot prevail thereunder by similarly offering a justification for his or her failure to satisfactorily explain the loss or disappearance of assets. Therefore, a debtor cannot ultimately prevail under § 727(a)(5) in the face of a failure by said debtor to corroborate via documentation his or her testimonial explanation for the loss or disappearance of assets, which testimonial explanation is otherwise unsatisfactory for purposes of § 727(a)(5), by merely demonstrating that an individual similar in nature to said debtor would not ordinarily have kept and preserved documents serving to corroborate said debtor's testimony. Put differently, a debtor, in order to prevail under § 727(a)(5), must produce corroborating documentation that he or she might not ordinarily keep, and which perhaps he or she might be absolved from having to keep under § 727(a)(3), if said debtor cannot otherwise satisfactorily explain a loss or disappearance of assets.[19] Additionally, the language of § 727(a)(5) is sufficiently different from that of § 727(a)(3) such that a court, with respect to a discharge objection under § 727(a)(5), needs neither (a) to concern itself with whether all corroborating evidence that a debtor could have introduced was, in fact, introduced (ie., whether a debtor failed to introduce documentation, or failed to call an independent witness, that might conceivably have helped his or her cause under § 727(a)(5)), nor (b) to enter any factual finding to the effect that all means of corroboration which a debtor has to offer with respect to the loss of any particular asset is that which the debtor has thus far utilized. Quite simply, if a court concludes that a debtor's bare testimonial explanation regarding the loss of a particular asset is, by itself, unconvincing and the debtor fails to timely and convincingly corroborate said testimony, then the debtor cannot prevail under § 727(a)(5).

### B. Whether PNC Presented a Prima Facie Case Under § 727(a)(5) With Respect to Each of the Above Assets?

PNC objects to the debtor's Chapter 7 discharge under § 727(a)(5) because, according to PNC, the debtor has failed to explain satisfactorily the loss of (a) the debtor's ownership interest in the Florida Realty, (b) certain of the debtor's Ferrari collection, and (c) a large portion of the debtor's art and rare wine collections.[20] For reasons set forth in the ensuing paragraphs of this opinion, the Court concludes that PNC has met its initial burden, or

19. The Court is aware of, and agrees with, the holding in *Mitchell* that a debtor, in order to prevail under § 727(a)(5), need not necessarily document his or her gambling or theft losses. *See Mitchell*, 74 B.R. at 462 & n. 3. However, the Court points out, as did the court in *Mitchell*, that such a debtor, without providing documentation, must otherwise convince a court that losses were incurred as a result of gambling or theft; in *Mitchell*, the court therein found credible the debtor's bare testimony, thus obviating the need for corroboration in any form. *See Id.*

20. The Court does not understand PNC to have advanced an objection to the debtor's discharge under § 727(a)(5) vis-a-vis the debtor's explanation, or lack thereof, with respect to the loss in value of the debtor's medical practice beginning in 1996. However, § 727(a)(3) and (5) are closely related, and situations fitting under (a)(3) will often fit comfortably within (a)(5) as well. *See 6 Collier on Bankruptcy* ¶ 727.08 at 727–47. Furthermore, the Court notes that the debtor's lack of documentation with respect to his accounts receivable as of May 30, 1997, as well as other documentary deficiencies with respect to his medical practice, may effectively serve to reduce the credibility of the debtor's explanation for the loss in value of his medical practice beginning in 1996. Notwithstanding the preceding, however, the Court, because it does not need to, will forego an extended analysis of § 727(a)(5) and the debtor's aforesaid explanation, or lack thereof, for the loss in value of his medical practice.

presented a *prima facie* case, under § 727(a)(5) with respect to each of the above assets.

■ With respect to the Florida Realty interest, PNC, prior to the debtor's explanation on May 3, 1999, presented evidence which shows that:

(a) the debtor owned an interest in the Florida Realty as of December 21, 1995, *see supra* pp. 86–87 (December 21, 1995 Financial Statement);

(b) said ownership interest in the Florida Realty was a one-half interest, *see supra* p. 92 (Debtor's deposition testimony to that effect);

(c) the value of said one-half interest was worth at least $125,000 between March 16, 1989, and December 21, 1995, given that (i) said realty was valued at between $250,000 and $350,000 during said time period, *see supra* pp. 86–87 (Financial Statements), and (ii) half of $250,000 is $125,000;

(d) said one-half interest was not encumbered by any mortgage as of May 18, 1993, and subsequent thereto, *see supra* pp. 86–87 & 93 (last three Financial Statements & debtor's deposition testimony to the effect that the debtor's impression was that he owned said one-half interest free and clear at some point);

(e) the debtor's equity in his one-half interest was at least $125,000 ($125,000 value less $0 mortgage); and

(f) the aforesaid one-half interest is no longer available for the debtor's creditors as of his petition filing date, *see supra* p. 87 (debtor's omission of said one-half interest from Bankruptcy Schedule B).

On the basis of the above, and before the debtor offered any explanation on May 3, 1999, PNC presented evidence which shows that (a) the debtor owned a valuable asset in the form of the Florida Realty interest within a reasonably short period of time prior to his petition filing, and (b) said asset is no longer available for the debtor's creditors. Therefore, PNC has met its initial burden, or presented a *prima facie* case, under § 727(a)(5) with respect to the Florida Realty interest.[21]

■ With respect to the debtor's Ferrari collection, PNC, prior to the debtor's explanation on May 3, 1999, presented evidence which shows that:

(a) the debtor owned (i) eleven Ferraris collectively valued at $3,200,000 as of July 20, 1993, *see supra* pp. 86–87 (July 20, 1993 Financial Statement), and (ii) Ferraris collectively valued at $2,500,000 as of December 21, 1995, *see supra* pp. 86–87 (December 21, 1995 Financial Statement);

(b) only six Ferraris collectively valued at $202,000 as of the debtor's petition filing date are now available for the

**21.** At the December 7, 1998 trial PNC submitted into evidence both a deed and the results of a title search with respect to the Florida Realty, *see* PNC's Trial Ex. 13–14, which material (a) collectively evidences that the debtor did not own an interest in the Florida Realty at least as far back as 1989, and (b) thus served to convince the Court that the debtor lacked an ownership interest in said realty at least as far back as 1989. *See* Feb. 25, 1999 Opinion, at 39. Notwithstanding said evidence and the preceding conclusion by the Court, PNC has met its initial burden, or presented a *prima facie* case, under § 727(a)(5) with respect to the Florida Realty interest because the debtor, in the face of such evidence and said conclusion by the Court, nevertheless continued to assert at trial on May 3, 1999, that he owned said realty interest up until at least some point in late 1995. Furthermore, the Court, because of the preceding testimony by the debtor, cannot, on the basis of its aforesaid prior conclusion, thereby absolve the debtor from his duty under § 727(a)(5) to explain the loss of the Florida Realty interest without also finding that the debtor (a) perjured himself on May 3, 1999, which perjury is, of course, actionable as contempt of this Court, and (b) knowingly and fraudulently made a false oath or account on May 3, 1999, which finding (i) is actionable under § 727(a)(4)(A), and (ii) would prompt the Court to grant PNC leave to amend its pleadings so as to conform to the evidence.

debtor's creditors, *see supra* p. 87 (Bankruptcy Schedule B);

(c) the debtor owned, as of December 2, 1996, both the Ferrari 330 GT 2+2 and the 400 SA Cabriolet Ferrari, *see* Dec. 2, 1996 Pa.D.M.V. record search; and

(d) the Ferrari 330 GT 2+2 and the 400 SA Cabriolet Ferrari are no longer available for the debtor's creditors, *see* Deb. Bankr.Sch. B (both vehicles omitted from said schedule).

On the basis of the above, and before the debtor offered any explanation on May 3, 1999, PNC presented evidence which shows that (a) the debtor, within a reasonably short period of time prior to his petition filing date, owned valuable assets in the form of five Ferraris which are no longer available for the debtor's creditors (hereafter "the Five Missing Ferraris"), (b) the Ferrari 330 GT 2+2 and the 400 SA Cabriolet Ferrari are included among the Five Missing Ferraris, and (c) these particular Ferraris are, as the Court's description of them suggests, no longer available for the debtor's creditors. Therefore, PNC has met its initial burden, or presented a *prima facie* case, under § 727(a)(5) with respect to the Five Missing Ferraris, including the Ferrari 330 GT 2+2 and the 400 SA Cabriolet Ferrari.

The debtor also testified on May 3, 1999, that the 1967 and 1971 Ferraris are no longer available for his creditors despite the fact that said vehicles are shown on his Bankruptcy Schedule B as being among the six Ferraris still owned by him as of his petition filing date. Because the listing of the 1967 and 1971 Ferraris in said Bankruptcy Schedule B constitutes compelling evidence that the debtor, at a minimum, owned said vehicles at some point within a reasonably short period of time prior to his petition filing date, and since PNC also presented independent evidence showing that the debtor owned said vehicles as of December 2, 1996, *see* Dec. 2, 1996 Pa.D.M.V. record search, PNC has met its initial burden, or presented a *pri-*

*ma facie* case, under § 727(a)(5) with respect to the 1967 and 1971 Ferraris.

▮▮▮ With respect to the debtor's collections of art and rare wine, PNC, prior to the debtor's explanation on May 3, 1999, presented evidence which shows that:

(a) the debtor owned an art collection valued at $100,000 as of May 18, 1993, *see supra* pp. 86–87 (May 18, 1993 Financial Statement);

(b) the debtor owned a rare wine collection valued at $90,000 as of March 16, 1989, *see supra* pp. 86–87 (March 16, 1989 Financial Statement);

(c) as of his petition filing date, the debtor owned fifteen pieces of artwork valued collectively at only $8,600, *see supra* p. 87 (Bankruptcy Schedule B);

(d) the aforesaid rare wine collection is no longer available for the debtor's creditors, *see supra* p. 87 (debtor's omission of rare wine collection from Bankruptcy Schedule B).

On the basis of the above, and before the debtor offered any explanation on May 3, 1999, PNC presented evidence which shows that (a) the debtor owned valuable assets in the form of the aforesaid art and rare wine collections within a reasonably short period of time prior to his petition filing, and (b) most of the aforesaid art collection and all of the rare wine collection are no longer available for the debtor's creditors. Therefore, PNC has met its initial burden, or presented a *prima facie* case, under § 727(a)(5) with respect to the art and rare wine collections.

▮▮▮ Because PNC has met its initial burden, or presented a *prima facie* case, under § 727(a)(5) with respect to the Florida Realty interest, the Five Missing Ferraris (including the Ferrari 330 GT 2+2 and the 400 SA Cabriolet Ferrari), the 1967 and 1971 Ferraris, and the debtor's art and rare wine collections, the debtor has the burden of explaining to the Court's satisfaction what precisely has happened to said assets and, in particular, why said assets are no longer available for the debt-

or's creditors.[22] For numerous reasons set forth below, the Court concludes that the debtor has not provided satisfactory explanations with respect to any of the above assets.

### C. *Whether the Debtor Provided Satisfactory Explanations for the Loss of Assets?*

■ As an initial matter, the Court takes note of the fact that the debtor, both at trial on December 7, 1998, and on May 3, 1999, failed to provide corroboration in any form for his explanations regarding the loss of the above assets. *See supra* pp. 98–99. Because the debtor failed to provide any such corroboration, the Court could then have ruled against the debtor under § 727(a)(5) provided that the Court (a) then determined that PNC had met its initial burden, or presented a *prima facie* case, under § 727(a)(5), and (b) was unconvinced as to any of the debtor's aforesaid testimonial explanations.[23] However, the Court, in the exercise of its discretion afforded by (a) its inherent powers and 11 U.S.C. § 105(a), and (b) the plain language of § 727(a), *see supra* p. 88 & note 1, chose to allow the debtor additional time to corroborate his aforesaid testimonial explanations, which additional time the Court limited to the same period that it provided for the debtor to produce recorded information responsive to PNC's action under § 727(a)(3). A recognition of the preceding is important because, given that the Court's exercise of its discretion is the only vehicle by which the debtor was afforded an additional opportunity to corroborate

---

**22.** The fact that the Internal Revenue Service presently possesses an apparently unavoidable tax lien upon all of the debtor's assets does not detract from the Court's conclusion that PNC has met its initial burden, or presented a *prima facie* case, under § 727(a)(5) with respect to the particular assets listed in the text above because (a) § 727(a)(5) requires that a debtor "explain satisfactorily ... any loss of assets ... to meet ... [said] debtor's liabilities," (b) § 727(a)(5) does not distinguish between encumbered and unencumbered assets, or between secured and unsecured liabilities of a debtor, (c) even if one should generally make the preceding distinctions when undertaking an analysis under § 727(a)(5), the loss of encumbered assets must nevertheless be explained if the liabilities which encumber said assets have not shrunk proportionately in an amount equal to the value of the encumbered assets which are shown to be missing (ie., a bankruptcy estate is harmed by a loss of encumbered assets if the encumbering debt does not shrink proportionately because said encumbering debt then becomes unsecured debt entitled to share in a distribution of assets that have not been lost), and (d) the encumbering liability to the Internal Revenue Service did not shrink proportionately in an amount equal to the value of the particular assets which have been shown to be missing herein.

**23.** It is certainly possible, and in fact may have been the case, that the debtor was unaware prior to trial on December 7, 1998, and on May 3, 1999, that the Court might find to be unsatisfactory his uncorroborated testimonial explanations for the loss of assets. Unfortunately for the debtor, he cannot succeed in arguing that, because of said lack of knowledge on his part, (a) he thus lacked sufficient advance notice that he would need to provide corroboration for his testimonial explanations, and (b) the Court is thus obligated to provide him with additional time to provide said corroboration. The Court must reject any such possible contention by the debtor because the debtor (a) is fully charged with knowledge of the applicable law surrounding § 727(a)(5), including the longstanding principle that bald testimony need not necessarily be, and quite often is not, accepted by a court as a satisfactory explanation under § 727(a)(5) for the loss of assets, *see supra* pp. 116–17, and (b) thus should have been prepared on both trial dates to corroborate his testimonial explanations. The debtor also cannot successfully argue that he is entitled to additional time to provide corroboration for his testimonial explanations given that he was unaware at trial that the burden of production had shifted to him under § 727(a)(5) because (a) the lack of prior knowledge that burdens of production or persuasion have shifted, as a matter of law, does not affect the timing of the parties' introduction of evidence at trial, *see supra* note 8, and (b) the debtor provided his testimonial explanations without prior knowledge of the aforesaid burden shifting, which means that he was well aware that he needed to endeavor to provide satisfactory explanations regarding the loss of assets whether or not the burden of production had shifted to him under § 727(a)(5).

his testimony, the Court can also discretionarily limit said opportunity to corroborate, such as by restricting the debtor's means of post-trial corroboration. The Court, in the exercise of its discretion, thus decided to confine the debtor's means of post-trial corroboration to the production of corroborating recorded information; put differently, the Court eliminated as a potential means of post-trial corroboration the introduction of witness testimony by the debtor. The Court placed the preceding constraint on the debtor's means of post-trial corroboration, *inter alia,* because (a) confining the debtor's means of post-trial corroboration to the introduction of recorded information dovetails with the Court's simultaneous allowance to the debtor of additional time to produce recorded information responsive to PNC's action under § 727(a)(3), (b) documentation, in the Court's view, is generally, if not always, a more reliable source for corroboration of one's testimony than is the testimony of third party witnesses, (c) the testimony of witnesses is generally not as efficient as the production of documentation since (i) such testimony requires additional trial time and expense, and (ii) such testimony, at least more often than not, will necessitate additional corroboration before it can have any corroborative value, (d) of the debtor's failure to appear before this Court on the March 25, 1999 trial date, along with the debtor's failure to provide (i) prior notice that he would not so appear, and (ii) just cause subsequently for either failing to so appear or failing to provide advance notice that he would not so appear, *see supra* pp. 98–99 and note 3, and (e) the debtor failed to produce pertinent witness testimony at trial on either December 7, 1998, or May 3, 1999. Having so determined that the debtor's only available means of post-trial corroboration is the production of corroborating recorded information, the Court now proceeds to ascertain whether the debtor's testimonial explanations regarding the loss of the assets in question, either by themselves or in conjunction with any documentation that the debtor ultimately produced, are satisfactory for purposes of § 727(a)(5).

With respect to the Florida Realty interest, the Court does not find convincing the debtor's testimonial explanation, by itself, that the debtor transferred said realty interest to his uncle's family. In particular, the Court has trouble believing that the debtor would have made such a transfer according to the terms to which he testified, to wit a transfer of said realty interest without receiving any cash consideration in return. *See supra* pp. 92–93. Although the debtor also testified that he received consideration for his disposition of said realty interest in the form of being relieved by his uncle's family from having to pay his share of an alleged $100,000 in expenses for alleged renovations to the Florida Realty, *see Id.,* the Court still finds the debtor's oral explanations wanting given that (a) the debtor appeared to possess, prior to the aforesaid renovations, substantial equity in his one-half interest in said realty equal to at least $125,000, *see supra* p. 119, (b) the alleged $100,000 in renovations to said realty would most certainly be expected to increase the fair market value of said realty and the debtor's ownership interest therein, albeit perhaps not in direct proportion to the $100,000 allegedly expended, (c) the debtor's equity in said realty interest thus would not be expected to decrease very much, if any, subsequent to said renovations, (d) said equity thus would exceed the debtor's $50,000 share of said renovations by a large amount, and (e) a reasonable person would insist on receiving the excess of said equity over the $50,000 share of renovation costs. The Court also cannot blindly accept the debtor's mere oral testimony regarding his alleged disposition of the Florida Realty interest given that (a) said transfer was allegedly made to members of his family, (b) the debtor cannot remember with any certainty when said transfer took place, *see supra* p. 92, and (c) the Court, as set forth in the February 25, 1999 Opinion, experiences great difficulty

in even believing the debtor's testimony that he ever owned the alleged one-half interest in the Florida Realty. *See supra* note 21. Therefore, the debtor, in order to satisfactorily explain the loss of his interest in the Florida Realty, needed to produce corroborating recorded information that supports his oral testimony as to such loss. Unfortunately for the debtor, he produced nothing with respect to said realty interest other than the June 9, 1980 Sales Agreement, *see supra* p. 108, which document, *inter alia,* fails to address, and thus cannot corroborate the debtor's explanation regarding, his alleged pre-petition disposition of his interest in the Florida Realty. *See supra* p. 109. Because the June 9, 1980 Sales Agreement does not corroborate the debtor's explanation for the loss of his interest in the Florida Realty, the Court (a) must conclude that PNC has proven, by a preponderance of the evidence, that the debtor failed to satisfactorily explain the loss of his ownership interest in the Florida Realty, (b) will thereby sustain PNC's objection under § 727(a)(5) to the debtor's Chapter 7 discharge, and (c) consequently will deny entry of the debtor's Chapter 7 discharge.[24]

 With respect to the Five Missing Ferraris, the Court concludes that the debtor only offered explanations for the loss of two of the aforesaid vehicles. The Court must conclude as much because (a) the debtor only offered explanations regarding the loss of the Ferrari 330 GT 2+2, the 512 TestaRossa Ferrari, the 400 SA Cabriolet Ferrari, and the 1967 and 1971 Ferraris, *see supra* pp. 92–94, (b) the Ferrari 330 GT 2+2 and the 512 TestaRossa Ferrari can only collectively constitute but one of the Five Missing Ferraris given that, according to the debtor, he

received the 512 TestaRossa Ferrari in exchange for the Ferrari 330 GT 2+2, *see supra* pp. 92–93, which means that he apparently never owned both vehicles at the same time, and (c) the 1967 and 1971 Ferraris are not included among the Five Missing Ferraris since they are shown on the debtor's Bankruptcy Schedule B as being among the six Ferraris still owned by the debtor as of his petition filing date. *See supra* pp. 93–94. Because the debtor failed to offer any explanation for, let alone a satisfactory explanation regarding, what happened to three of the Five Missing Ferraris, the Court (a) must conclude that PNC has proven, by a preponderance of the evidence, that the debtor failed to satisfactorily explain the loss of these three vehicles, (b) will thereby sustain PNC's objection under § 727(a)(5) to the debtor's Chapter 7 discharge, and (c) consequently will deny entry of the debtor's Chapter 7 discharge.

With respect to the Ferrari 330 GT 2+2, the 512 TestaRossa Ferrari, and the 400 SA Cabriolet Ferrari, the Court finds that it is entirely conceivable that the debtor transferred each of said vehicles in the manner to which he testified. The preceding notwithstanding, however, the Court also notes that it is equally conceivable that the transfers testified to by the debtor may not have occurred at all, or may not have occurred in the fashion testified to by the debtor. The latter possibility is made all the more likely given the information contained within the December 2, 1996 Pa.D.M.V. record search, which information is, at a minimum, somewhat inconsistent with the debtor's oral testimony. *See supra* pp. 93–94. That being the case, the Court is constrained to conclude

---

24. As explained above, the debtor has not convinced the Court that he actually transferred his interest in the Florida Realty to his uncle's family. However, the Court notes that, if all of the debtor's testimony regarding his alleged transfer of said ownership interest is to be believed, then the debtor, with respect to said ownership interest, has potentially engaged in (a) a fraudulent conveyance thereof

given that one can infer from said testimony, as demonstrated above, that the debtor transferred said realty interest for consideration less than what said realty interest was then worth, and (b) a preferential transfer thereof given that the debtor testified that he thought that said transfer occurred within the one-year period prior to the commencement of the instant bankruptcy case. *See supra* p. 92.

that the debtor's testimony with respect to the Ferrari 330 GT 2 + 2, the 512 Testa-Rossa Ferrari, and the 400 SA Cabriolet Ferrari is not so convincing such that, by itself, it serves to satisfactorily explain the losses of said vehicles. Therefore, the debtor, in order to satisfactorily explain the loss of the three vehicles in question, needed to produce corroborating documentation sufficient to convince the Court as to the veracity of his testimony with respect to said vehicles. Unfortunately for the debtor, he produced nothing relevant to the three vehicles in question other than the Spangler letter, *see supra* p. 108–09, which letter, for several reasons, does not constitute corroborating documentation sufficient to convince the Court as to the veracity of the debtor's testimony. First, the assertions made within the Spangler letter, even though they may be true, nevertheless constitute inadmissible hearsay under the Federal Rules of Evidence to the extent that they are offered as corroboration for the debtor's testimony. The preceding conclusion necessarily follows because (a) " 'hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted," Fed.R.Evid. 801(c), 28 U.S.C.A. (West 1984), (b) the assertions made within the Spangler letter can only provide corroborative value if the Court accepts said assertions as proof of the truth of the matters which are the subject of said assertions, (c) the assertions contained within the Spangler letter thus constitute hearsay to the extent that they are offered to corroborate the debtor's testimony, and (d) said hearsay, which is generally inadmissible as evidence pursuant to Fed.R.Evid. 802, is also not subject to any exception to the exclusionary rule of Fed.R.Evid. 802. Of course, hearsay statements such as those contained within the Spangler letter, even if in written form, are accompanied by several concerns that negatively impact the reliability of said statements as corroborative proof. *See supra* pp. 109–10 and note 13. Second, and as noted earlier, a

concern for the authenticity of the Spangler letter exists which serves to negatively impact the reliability of said letter as corroborative proof. *See supra* p. 110 and note 13. Third, and as also noted earlier, the Spangler letter fails to address several matters the corroboration of which is necessary before the Court can be convinced as to the truth of the debtor's testimony regarding the losses of the three vehicles in question, to wit (a) whether the transactions described within the Spangler letter were ever actually and completely consummated, and (b) the ultimate disposition of the 512 TestaRossa Ferrari, which automobile the debtor only orally contends was sold in 1995 with the sales proceeds going to Northside Bank. *See supra* p. 110. Because of these aforesaid concerns raised by the Spangler letter, said letter, by itself, does not operate to convince the Court of the veracity of the debtor's testimonial explanations regarding the loss of the Ferrari 330 GT 2 + 2, the 512 TestaRossa Ferrari, and the 400 SA Cabriolet Ferrari. Since the debtor has not produced sufficient corroborating documentation, the Court (a) must conclude that PNC has proven, by a preponderance of the evidence, that the debtor failed to satisfactorily explain the loss of the Ferrari 330 GT 2 + 2, the 512 TestaRossa Ferrari, and the 400 SA Cabriolet Ferrari, (b) will thereby sustain PNC's objection under § 727(a)(5) to the debtor's Chapter 7 discharge, and (c) consequently will deny entry of the debtor's Chapter 7 discharge.

The Court also notes that the debtor failed to offer any oral explanation, much less corroborating recorded information, as to what he did with the $75,000 in proceeds which, according to the contents of the Spangler letter, he supposedly obtained from the alleged April 1996 sale of the 400 SA Cabriolet Ferrari. *See supra* p. 110. Because the contents of the Spangler letter constitute some evidence that the debtor, within a reasonably short period of time prior to his petition filing, pos-

sessed the aforesaid $75,000 in sales proceeds, and since said sales proceeds are not listed in the debtor's Bankruptcy Schedule B as being available for his creditors, PNC has met its initial burden, or presented a *prima facie* case, under § 727(a)(5) with respect to said sales proceeds. The burden thus having shifted to the debtor to satisfactorily explain the loss of said sales proceeds, the debtor's aforesaid failure to provide such an explanation provides yet another reason why the Court will sustain PNC's objection under § 727(a)(5) to, and consequently will deny entry of, the debtor's Chapter 7 discharge.

As for the 1967 and 1971 Ferraris, the Court most certainly is not convinced by the debtor's bare testimony that said vehicles are not available for his creditors because they are presently owned by Glasso. *See supra* p. 93. As an initial matter, the Court points out that it necessarily must be skeptical of such testimony by the debtor in light of the fact that said vehicles are shown on his Bankruptcy Schedule B as being among the six Ferraris still owned by him as of his petition filing date. *See supra* p. 93. The Court's skepticism regarding the debtor's testimony is further fueled, however, by (a) the bewildering nature of much of the debtor's testimony regarding the 1967 and 1971 Ferraris, *see supra* pp. 93–94, (b) the inconsistency, and the debtor's inability to explain said inconsistency, between the debtor's testimony and information contained in the December 2, 1996 Pa. D.M.V. record search, *see supra* p. 93, and (c) the debtor's admission that he retained possession of at least one, and perhaps both, of the two vehicles as of the date of his petition filing. *See supra* pp. 93–94. Because of the unconvincing nature of the debtor's testimony, the debtor, in order to satisfactorily explain the loss of the 1967 and 1971 Ferraris, needed to produce corroborating documentation sufficient to convince the Court that Glasso now owns said vehicles. Unfortunately for the debtor, the Court concludes, for several reasons, that the debtor did not

produce corroborating documentation sufficient to convince the Court that Glasso now owns the 1967 and 1971 Ferraris notwithstanding the debtor's production of the Glasso affidavit, the copy of the June 6, 1996 Agreement of Loan/Sale, and the copies of the two cashier's checks used by the debtor to purchase the 1967 and 1971 Ferraris. First, the assertions made within the Glasso affidavit, much like, and for the same reasons set forth with respect to, those assertions made within the Spangler letter, constitute inadmissible hearsay under the Federal Rules of Evidence to the extent that they are offered as corroboration for the debtor's testimony. *See supra* pp. 123–24 and note 13. Given that said assertions constitute inadmissible hearsay, and because of the attendant concerns that accompany said hearsay, the contents of the Glasso affidavit are unreliable and, thus, do not, by themselves, provide much in the way of corroborative aid for the debtor's testimony. Second, and as noted earlier, a concern for the authenticity of the June 6, 1996 Agreement of Loan/Sale exists, which concern operates to make said document, at best, only *marginally more reliable* than the Glasso affidavit. *See supra* pp. 110–11 and note 13. Third, the June 6, 1996 Agreement of Loan/Sale and the two cashier's checks, even accepting *arguendo* that they constitute more reliable evidence of that which was attested to by Glasso in his affidavit, nevertheless, by themselves, fail to address whether, and thus cannot corroborate the debtor's testimony that, Glasso actually owns the 1967 and 1971 Ferraris at the present time (ie., neither document establishes that the debtor defaulted in his repayment of his debt to Glasso, which default allegedly triggered the reclassification of the June 6, 1996 transaction into a sale by the debtor of the 1967 and 1971 Ferraris to Glasso). *See* Ex. C to Oct. 4, 1999 Deb. Status Rep. Fourth, and perhaps most importantly, certain of the assertions made within the Glasso affidavit and certain of

the terms expressed within the June 6, 1996 Agreement of Loan/Sale conflict, and simply cannot be reconciled, with (a) portions of the debtor's testimony, (b) answers by the debtor to specific questions in his Bankruptcy Statement of Financial Affairs, and (c) the debtor's bankruptcy schedules, wherein ownership and encumbrance of, *inter alia,* the 1967 and 1971 Ferraris as of the commencement of the instant case is denoted. In particular, Glasso stated in his affidavit that he loaned the debtor money to purchase the 1967 and 1971 Ferraris outright from Baierl in June 1996. *See supra* p. 87. Furthermore, the conditions set forth in the June 6, 1996 Agreement of Loan/Sale purport to document a purchase by the debtor of said vehicles via a loan from Glasso of the funds to finance such transaction. *See* Ex. C to Oct. 4, 1999 Deb. Status Rep. The June 6, 1996 Agreement of Loan/Sale also provides—and Glasso asserts in his affidavit that said document so provides—*inter alia,* that (a) the debtor will repay the borrowed funds to Glasso within 60 days from June 6, 1996, (b) the debtor will sign a judgment note for the borrowed funds, (c) Glasso will retain a security interest in the two vehicles to secure the aforesaid loan, and (d) the debtor's failure to repay the borrowed funds to Glasso by August 6, 1996 will result in a reclassification of the June 6,

1996 Agreement of Loan/Sale such that it "will be considered a sale of both vehicles [by the debtor] to ... Glasso." *See Id.* All of the preceding, however, is directly contrary to (a) the debtor's testimony that Glasso, rather than the debtor, purchased the 1967 and 1971 Ferraris from Baierl, and that the debtor then leased said vehicles from Glasso, *see supra* p. 93, (b) the debtor's answer to question 10 in his Bankruptcy Statement of Financial Affairs, to wit that he had not "transferred [property] either absolutely or as security within one year immediately preceding the [May 30, 1997] commencement of this case," given that the Glasso affidavit and the June 6, 1996 Agreement of Loan/Sale purport to describe June 6, 1996 transfers by the debtor of (i) a security interest in the 1967 and 1971 Ferraris, and (ii) ownership in said vehicles via some sort of reclassification on August 6, 1996,[25] and (c) the debtor's representation in his bankruptcy schedules that he owned, subject to encumbrance in favor of Glasso, the 1967 and 1971 Ferraris as of the commencement of the instant case given that, according to the Glasso affidavit and the June 6, 1996 Agreement of Loan/Sale, said vehicles were, by recharacterization on August 6, 1996, viewed as having been sold by the debtor to Glasso on June 6, 1996.[26] Because of the inconsistencies

**25.** The Court also notes that, if the debtor sold the 1967 and 1971 Ferraris to Glasso on June 6, 1996, via the aforesaid reclassification on August 6, 1996, then the debtor, who apparently was still in possession of said vehicles as of the commencement of the instant case, held said vehicles for the benefit of Glasso. However, that the debtor so held the 1967 and 1971 Ferraris is inconsistent with the debtor's answer to question 14 in the debtor's Bankruptcy Statement of Financial Affairs, wherein the debtor indicated that, as of his petition filing, he did not hold or control property that was then owned by another person.

**26.** The Court notes that it need not address the legal effect of the clause in the June 6, 1996 Agreement of Loan/Sale that purports, in the event of default by the debtor on the purported judgment note on August 6, 1996,

to reclassify the characterization of the June 6, 1996 transaction between the debtor and Glasso because (a) the June 6, 1996 Agreement of Loan/Sale, even without said clause, memorializes a purchase by the debtor of the vehicles in question rather than a lease thereof from Glasso, (b) were it not for the presence of said clause, then Glasso's physical repossession of the 1967 and 1971 Ferraris would constitute an act that the debtor would have been obliged to report in answer to question 5 in his Bankruptcy Statement of Financial Affairs (ie., listing of all property that has been repossessed by a creditor within one year of bankruptcy), (c) the June 6, 1996 Agreement of Loan/Sale, even without said clause, memorializes a transaction that is inconsistent with what the debtor reported in his Bankruptcy Schedules B & D with respect to the vehicles in question, and (d) the nullification of said clause would not operate to

just noted, the Court must question whether (a) certain of the assertions made within the Glasso affidavit are truly reflective of what happened to the 1967 and 1971 Ferraris, and (b) certain of the terms expressed within the June 6, 1996 Agreement of Loan/Sale accurately memorialize the transaction between the debtor and Glasso. The Court, in light of all of the above, must conclude that the recorded information produced by the debtor regarding the 1967 and 1971 Ferraris does not serve to sufficiently corroborate the debtor's testimony that Glasso now owns said vehicles. Because the debtor has not produced sufficiently corroborative documentation, the Court (a) must conclude that PNC has proven, by a preponderance of the evidence, that the debtor failed to satisfactorily explain the loss of the 1967 and 1971 Ferraris, and (b) will thereby sustain PNC's objection under § 727(a)(5) to the debtor's Chapter 7 discharge, and (c) consequently will deny entry of the debtor's Chapter 7 discharge.

■ As for the debtor's art collection, the Court finds unconvincing the debtor's testimonial explanation, by itself, that said collection, although valued at $100,000 in certain of the Financial Statements, was nevertheless never worth more than $8,600, *see supra* p. 93, which valuation is that which is placed upon said art collection in the debtor's Bankruptcy Schedule B. The debtor testified that the preceding discrepancy in values attributed to said art collection arose merely as the result of an incorrect estimate on the debtor's part with respect to said collection. *See supra* p. 93. The Court is troubled by the preceding explanation, however, because the Court does not find it likely that one would simply overestimate by $91,400 the value of an asset worth only $8,600. Furthermore, although one can hypothesize that the debtor, in fact, arrived at the aforesaid $100,000 valuation in bad faith, and thus

that the art collection was actually never worth more than $8,600 as the debtor now testifies, such a hypothesis, by itself, most certainly cannot suffice to satisfy the debtor's duty to explain under § 727(a)(5). Therefore, the debtor, in order to prevail under § 727(a)(5) with respect to his art collection in particular, needed to produce corroborating documentation sufficient to convince the Court of the veracity of the debtor's testimony; put differently, the debtor needed to produce recorded information that supports his oral explanation that his art collection was never worth more than the aforesaid $8,600. The Court can envision that receipts for the debtor's original purchase of the artwork comprising said art collection might have sufficed, or at least would have aided the debtor in his effort, to corroborate his testimony that said art collection was never worth more than $8,600. Unfortunately for the debtor, he failed to produce any corroborating documentation such as, *inter alia*, purchase receipts for artwork, *see supra* pp. 108–09, notwithstanding the debtor's testimony that he retains and has located some old receipts pertaining to the art collection. *See supra* p. 93. Because the debtor has not produced the requisite corroborating documentation, the Court (a) must conclude that PNC has proven, by a preponderance of the evidence, that the debtor failed to satisfactorily explain the loss of a substantial portion of his art collection, which collection was valued at $100,000 pre-petition, (b) will thereby sustain PNC's objection under § 727(a)(5) to the debtor's Chapter 7 discharge, and (c) consequently will deny entry of the debtor's Chapter 7 discharge.

■ With respect to the debtor's rare wine collection, the Court notes that the debtor, during the trial, failed to offer any explanation for, let alone a satisfactory explanation regarding, what happened to said wine collection. *See supra* p. 94.

eliminate the transfer avoidance issues under §§ 544 and 547(b) discussed above. *See su-*

*pra* note 14.

However, the debtor apparently testified during a deposition that he possessed approximately 2,000 bottles of wine at one time, but that he had disposed of most of the wine prior to the commencement of the instant case. *See supra* pp. 93–94. Although the substance of such testimony is plausible, the Court finds equally plausible, for instance, that said wine has not yet been disposed of. That being the case, the debtor needed to come forward with documentation that corroborates his oral explanation. Unfortunately for the debtor, he failed to produce any corroborating documentation with respect to the rare wine collection. *See supra* pp. 108–09. Because the debtor has not produced the requisite corroborating documentation, the Court (a) must conclude that PNC has proven, by a preponderance of the evidence, that the debtor failed to satisfactorily explain the loss of a substantial portion of his rare wine collection, which collection was valued at $90,000 at one point pre-petition, (b) will thereby sustain PNC's objection under § 727(a)(5) to the debtor's Chapter 7 discharge, and (c) consequently will deny entry of the debtor's Chapter 7 discharge.

### CONCLUSION

The Court notes that, if it had proceeded to rule on PNC's discharge objections at the close of trial on May 3, 1999, then it could have dispensed with much of the preceding analysis and ruled as it does at this time given that the debtor, as of the close of trial, had not produced any recorded information or third-party witness testimony. However, and for the reasons explained above, the Court discretionarily afforded to the debtor additional time in which to provide a defense to PNC's action under § 727(a)(3) and (5). Because said additional time has passed, and in accordance with the rationale of the Court set forth in great detail in the body of the instant opinion, the Court now draws the following conclusions:

(a) PNC has proven, by a preponderance of the evidence, that the debtor has either concealed, or failed to keep or preserve, recorded information (i) from which the financial condition of, or recent transactions with respect to, the debtor's medical practice might be ascertained, and (ii) from which the debtor's financial condition with respect to his nonbusiness assets (ie., the Florida Realty interest, the debtor's Ferrari collection, and the debtor's ·art and rare wine collections) might be ascertained;

(b) The debtor has not justified his concealment of, and/or failure to keep or preserve, the recorded information described in the preceding paragraph;

(c) On the basis of the two preceding conclusions, PNC's objection to the debtor's Chapter 7 discharge under § 727(a)(3) shall be sustained;

(d) PNC has proven, by a preponderance of the evidence, that the debtor failed to satisfactorily explain the loss or disappearance of his Florida Realty interest, the Five Missing Ferraris (including the Ferrari 330 GT 2+2 and the 400 SA Cabriolet Ferrari), the 1967 and 1971 Ferraris, and the debtor's art and rare wine collections;

(e) On the basis of the preceding conclusion, PNC's objection to the debtor's Chapter 7 discharge under § 727(a)(5) shall be sustained.

Because the Court sustains PNC's discharge objections under § 727(a)(3) and (5), the Court shall also, and does hereby at this time, deny entry of the debtor's Chapter 7 discharge. The preceding decision has the practical effect of (a) nullifying that part of the Court's earlier decision of February 25, 1999, to the effect that PNC's judgment claim is discharged given that said decision was predicated on the Court's eventual entry of a Chapter 7 discharge for the debtor, which entry now will not occur, (b) terminating the automatic stay in the instant bankruptcy case, *see* 11 U.S.C.A. § 362(c)(2)(C) (West 1993), and (c) returning the debtor and his prepetition creditors to their respective pre-

petition positions vis-a-vis the debtor's liability to said creditors.